**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| VIVEK SHAH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:26-cv-01605-HDV-KES |
| | ) | |
| v. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| DREXEL CHEMICAL COMPANY, | ) | **Demand for Jury Trial** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PROCEDURAL BACKGROUND

This First Amended Complaint amends the original Complaint filed on February 11, 2026 (Dkt. 1). The original Complaint asserted a single cause of action under California Penal Code § 631(a) arising from Defendant's real-time interception of my electronic communications while I used https://www.drexchem.com/, including the real-time transmission of my search queries to Google. This First Amended Complaint preserves that core allegation and adds related privacy, fraud, restitution, CIPA § 632(a), and Federal Wiretap Act claims, all of which arise out of the same conduct, transaction, and occurrence set out — and attempted to be set out — in the original Complaint, namely Defendant's deliberate architectural choices that caused the contents of visitor electronic communications with Defendant's Website to be transmitted, in real time and without consent, to a constellation of third-party companies. The new claims are based on the same continuous course of conduct and rely on factual allegations of the same kind already alleged in the original Complaint, supplemented by additional documentary evidence — including Chrome Developer Tools screenshots and HTTP Archive ("HAR") files — that I have

collected for the relevant period to substantiate the allegations. The First Amended Complaint accordingly relates back to the date of the original Complaint under Federal Rule of Civil Procedure 15(c)(1)(B). This amendment is made as of right under Federal Rule of Civil Procedure 15(a)(1)(B).

## I. NATURE OF THE ACTION

1. This First Amended Complaint concerns an egregious violation of my statutory and common-law privacy rights and a pervasive breach of trust by Defendant Drexel Chemical Company. Defendant owns and operates the commercial website located at https://www.drexchem.com/ (the "Website"), through which it markets, advertises, and promotes more than five hundred agricultural chemical products — including pesticides, herbicides, fungicides, insecticides, adjuvants, surfactants, and turf growth regulators — to growers, applicators, distributors, retailers, regulators, and consumers nationwide, including in the State of California.

2. Defendant has engineered its Website to hand the contents of its visitors' electronic communications to a constellation of third-party corporations in real time, without consent, and in many instances before any notice or consent mechanism is ever displayed. The Third Parties that Defendant has caused to intercept my communications and the communications of other California visitors include, without limitation: (a) Google LLC and its various subsidiaries and properties (including clients1.google.com, fonts.googleapis.com, fonts.gstatic.com, ajax.googleapis.com, and www.gstatic.com) ("Google"); (b) Vimeo, Inc. and its content-delivery, telemetry, and tracking subdomains (including player.vimeo.com, arclight.vimeo.com, lensflare.vimeo.com, f.vimeocdn.com, i.vimeocdn.com, vod-adaptive-ak.vimeocdn.com, and videoapi-sprites.vimeocdn.com) ("Vimeo"); (c) Bending Spoons S.p.A., an Italian joint-stock

company, and Bending Spoons US Inc., its Delaware subsidiary (together, "Bending Spoons"); (d) Fonticons, Inc. doing business as "Font Awesome" (use.fontawesome.com) ("Font Awesome"); (e) the operator of browser-update.org ("Update AG"); and (f) the operator of the "CookieAdmin" consent management platform that Defendant deploys on certain pages of the Website (collectively, the "Third Parties").

3. When I visited Defendant's Website from my computer located in Los Angeles County, California, Defendant's Website immediately caused at least two third-party tracking cookies — the "__cf_bm" cookie and the "_cfuvid" cookie, each set by Vimeo on the ".vimeo.com" cookie domain — to be placed on my device and browser, before I was presented with any notice of the use of cookies, any notice at collection of personal information, any privacy policy, any terms of use, any consent mechanism, or any opportunity to decline the placement of such cookies. Defendant's Website did this every time I visited its About Us page.

4. When I typed text — any text whatsoever — into Defendant's on-site search bar, Defendant's Website caused each individual keystroke I typed to generate a separate outbound HTTPS GET request to the domain clients1.google.com, owned and operated by Google. That request contained within its URL query string the cumulative search string I had typed up to and including that keystroke. Stated in plain English: every single letter I pressed on my keyboard while focused on Defendant's search bar caused my web browser to send a separate message across the Internet to Google, and each of those messages contained — word-by-word, letter-by-letter — exactly what I had typed so far. A single search-bar entry of an N-character query therefore caused at least N discrete interception events, one per keystroke, each conveying to Google a snapshot of my in-progress search query.

5. When I visited Defendant's "About Us" page at https://www.drexchem.com/about-us/, Defendant's Website automatically and without any action on my part caused an embedded Vimeo video player (pointing to Vimeo video identifier 463998552) to load and to autoplay. In so doing, Defendant's Website caused my device metadata, browser local-storage identifier, browser session identifier, and other signaling information to be transmitted to Vimeo's telemetry endpoints (including arclight.vimeo.com/add/player-stats and lensflare.vimeo.com/add/vimeo.play_video). On at least one post-November 24, 2025 visit to the About Us page, Defendant's Website further caused Vimeo, in turn, to transmit a JSON payload identifying my device type, session, and environment to Bending Spoons (orion.bendingspoons.com/v3/identity/settings) — the corporate parent of Vimeo as of November 24, 2025 — for identity-resolution purposes.

6. When I visited Defendant's "Resources" page at https://www.drexchem.com/resources/, Defendant's Website presented me with a popup cookie consent banner generated by the "CookieAdmin" consent management platform. The banner stated: "We respect your privacy. Cookies help us improve your experience, deliver personalized content, and analyze traffic. You can choose which cookies to allow by clicking Customize. Click Accept All to consent or Reject All to decline non-essential cookies." The banner presented three buttons: "Customize," "Reject All," and "Accept All." I clicked "Reject All." Despite my express election to reject all non-essential cookies, Defendant's Website continued to cause third-party cookies and tracking technologies to be placed on my device, and continued to cause the contents of my communications to be transmitted to third parties.

7. Defendant publishes on its Website a document captioned "Privacy Statement" at https://www.drexchem.com/privacy-statement-3/. That document represents, among other things,

that "Drexel Chemical Company does not sell, rent or lease its customer lists to third parties." It further represents that "All such third parties are prohibited from using your personal information except to provide these services to Drexel Chemical Company, and they are required to maintain the confidentiality of your information." Those representations are false. Defendant permits and enables the Third Parties — including Google and (post-November 24, 2025) Bending Spoons — to collect and, upon information and belief and consistent with those Third Parties' publicly disclosed data-driven business models, to use the data so collected for their own independent commercial purposes, including analytics, profiling, advertising, and related uses.

8. These practices — the placement of third-party cookies before notice or consent, the contemporaneous keystroke-level interception of my search queries, the automatic transmission of my device and session metadata to Vimeo and Bending Spoons during the autoplay of embedded video content, the continued tracking after my express rejection of non-essential cookies on the Resources page, and the material misrepresentations in Defendant's Privacy Statement — violate California Penal Code §§ 631(a) and 632(a), the Federal Wiretap Act (18 U.S.C. § 2511), Article I, Section 1 of the California Constitution, and California common-law prohibitions on intrusion upon seclusion, fraud and deceit, and unjust enrichment.

9. I seek statutory damages, actual damages, punitive damages, nominal damages, restitution, disgorgement, declaratory relief, public and private permanent injunctive relief, and costs. I also demand trial by jury on all issues so triable.

## II. THE PARTIES

10. I, Vivek Shah, am a natural person, a citizen of the United States, and a resident of Los Angeles County, California. I am, and at all times relevant to this First Amended Complaint

have been, a citizen of the State of California. I intend to remain domiciled in California and I make my permanent home here.

11. Defendant Drexel Chemical Company is a for-profit corporation organized and existing under the laws of the State of Tennessee, with its principal place of business at 1700 Channel Avenue, Memphis, Tennessee 38113. Defendant owns, operates, and controls the Website located at https://www.drexchem.com/. Defendant is a citizen of the State of Tennessee for purposes of 28 U.S.C. § 1332. According to its own public-facing materials and third-party directory services, Defendant has approximately two hundred to five hundred employees, annual revenue estimated at approximately $147.2 million, and markets more than five hundred agricultural chemical products throughout the United States and in international markets, including to growers, applicators, distributors, and retailers located in the State of California.

## III. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the laws of the United States — specifically, the Federal Wiretap Act, 18 U.S.C. § 2511.

13. This Court additionally has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. I am a citizen of California; Defendant is a citizen of Tennessee. California Penal Code § 637.2(a) provides statutory damages for violations of California Penal Code §§ 631(a) and 632(a); the Federal Wiretap Act provides statutory damages, actual damages, and any profits made by the violator under 18 U.S.C. § 2520; and the common-law and constitutional claims permit recovery of compensatory, punitive, restitutionary, and equitable relief. The aggregate value of the claims at issue, including the statutory and other

damages available under the foregoing causes of action, far exceeds the $75,000 jurisdictional threshold.

14. This Court additionally has supplemental jurisdiction over my state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same common nucleus of operative fact as my federal claim — namely, Defendant's interception, and aiding and abetting of third-party interception, of the contents of my electronic communications with the Website.

15. This Court has personal jurisdiction over Defendant because Defendant is subject to jurisdiction under California's "long-arm" statute, Cal. Code Civ. Proc. § 410.10, because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

16. Defendant purposefully directs its commercial activities toward the State of California and toward California residents, including by: (a) operating an interactive commercial Website that accepts communications from, and transmits communications to, California residents including me; (b) marketing and promoting its agricultural chemical products — including products bearing California Department of Pesticide Regulation registration numbers and California product labels — to California growers, applicators, distributors, and retailers through the Website; (c) employing and being represented by sales representatives who solicit business from California customers, including without limitation the Sales Representative described in Defendant's Resources post entitled "Drexel Adds West Coast Sales Representative" (which describes Defendant's new "West Coast Sales Representative"); (d) intentionally placing its Website's HTTP server responses within the interstate data streams that it knows California residents will and do access; (e) knowingly configuring its Website to detect California-based IP addresses and user locations and to transmit California-origin data to the Third Parties for the

Third Parties' commercial exploitation; and (f) receiving substantial commercial benefit from its sale of agricultural chemicals to California-based buyers and from the monetization of California residents' data by and through the Third Parties.

17. Defendant's Website is an interactive commercial website. Defendant has actual and constructive knowledge that Californians — including me — use its Website, because (among other indicia): (i) Defendant solicits "Registration" from growers and applicators through the Website and does not exclude California users; (ii) Defendant's product pages include pesticide products with California Department of Pesticide Regulation registration information; (iii) Defendant's "International" and "Careers" pages expressly address a national and international user base; (iv) Defendant has engaged a "West Coast Sales Representative" whose territory necessarily includes California; and (v) Defendant receives, from the Third Parties it has chosen to deploy on its Website, a continuous stream of IP-geolocation data identifying California-based visitors. Defendant exploits this audience — including its California audience — for commercial gain.

18. My claims arise out of and relate to Defendant's conduct purposefully directed toward California because: (a) I accessed Defendant's Website from Los Angeles County, California; (b) the third-party cookies that Defendant's Website placed on my device were placed on my device while it was physically located in California; (c) the interceptions of my electronic communications by Defendant and the Third Parties occurred on my California-based device and as data packets traversed California-based networking infrastructure before egressing the State; (d) the harms I suffered — including the invasion of my privacy, the diminution of value of my personal data, the loss of control over my private communications, and the statutory violations catalogued below — were suffered in California; and (e) the commercial benefit Defendant has

received from its interception and aiding-and-abetting interception of my communications was knowingly collected from a California resident in California.

19. The exercise of personal jurisdiction over Defendant comports with fair play and substantial justice because Defendant deliberately engages California-based commercial traffic, reasonably could foresee being haled into a California court for intercepting California residents' electronic communications, and has the resources and capacity to litigate in this District. California has a powerful sovereign interest in protecting the privacy of its residents and in enforcing the California Invasion of Privacy Act and Article I, Section 1 of the California Constitution.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to my claims occurred in this District: I was physically located in this District — specifically, Los Angeles County — when I accessed Defendant's Website, when the unauthorized cookies were placed on my device, when my search queries were intercepted at the keystroke level, and when the autoplay of Defendant's embedded Vimeo video content caused my session metadata to be transmitted to Vimeo and Bending Spoons. This District is intra-state from the situs of my electronic communications and the locus of the statutory privacy violations.

## IV. FACTUAL ALLEGATIONS

### *A. Technical Concepts and Terminology*

21. Because the claims in this First Amended Complaint turn on facts of technical web-infrastructure operation, I set out below — in plain English, and for the benefit of the Court, Defendant, and any trier of fact — the technical terminology used throughout this First Amended

Complaint. I define each term once, here, and use these terms thereafter without further definition.

22. "HTTP" stands for Hypertext Transfer Protocol. It is the standard protocol by which web browsers request, and web servers deliver, information across the Internet. "HTTPS" is HTTP encrypted using Transport Layer Security, such that the contents of the request and response cannot be read by intermediaries between the browser and the server (but can be read by both endpoints — i.e., the browser and the server). When a web browser loads a web page, it makes one or more HTTPS "requests" to a server, and the server replies with an HTTPS "response." In the course of loading a single web page, a modern browser typically makes many HTTP(S) requests — for the main HTML document, for the associated JavaScript, CSS, images, fonts, icons, videos, embedded content, and so on. Each request is a separate message sent across the Internet; each response is a separate message returned to the browser.

23. A "domain" (also called a "host") is the Internet address of a server identified by a human-readable name such as "drexchem.com" or "clients1.google.com." A "subdomain" is a name prefixed to a parent domain (such as "clients1" before "google.com," yielding the full name "clients1.google.com"). Each domain and subdomain is associated, through the Internet's Domain Name System, with one or more IP addresses — numerical identifiers for the actual servers that respond to requests sent to that name.

24. A "first-party" domain, in the context of web browsing, is the domain shown in the browser's address bar — the domain the user intended to visit. A "third-party" domain is any other domain to which the browser sends or receives messages while rendering the page at the first-party domain. In the context of this action, "drexchem.com" is the first-party domain; "clients1.google.com," "fonts.googleapis.com," "player.vimeo.com,"

"orion.bendingspoons.com," and similar domains are third-party domains, because a visitor accessing drexchem.com did not separately navigate to any of those domains and typically does not see, in the browser address bar, any indication that the browser is communicating with them.

25. A "cross-site" or "cross-origin" request is an HTTP(S) request made by a user's browser from the context of one domain (the first party) to a different domain (a third party). When I allege that Defendant's Website caused my browser to transmit data to a third party, I mean that — while I was viewing a page at drexchem.com — the code on that page caused my browser to send one or more cross-site HTTP(S) requests to a different domain, owned and controlled by a different entity, without any indication in the browser address bar that such cross-site requests were occurring. Each such cross-site request conveys, at a minimum: (i) my IP address (from which the third party can derive my approximate geographic location); (ii) my User-Agent string (identifying my web browser, my browser version, my operating system, my device platform, and various related characteristics); (iii) my "Referer" header (identifying the page on drexchem.com from which the cross-site request originated); (iv) any cookies associated with the third-party domain that my browser has previously stored; and (v) the URL of the request, including any query-string parameters (such as, in the case of the clients1.google.com requests at issue here, the text of the in-progress search query I was typing).

26. A "cookie" is a small data file that a server instructs a browser to store on the user's device and to transmit back to that server on subsequent requests. Cookies are associated with specific domains; only the server at the associated domain (and its subdomains, if the cookie is so configured) can read a given cookie on subsequent requests. Cookies can be set to expire after a specific date (a "persistent" cookie) or to expire when the browser is closed (a "session" cookie). A cookie can be set either by the first-party domain (a "first-party cookie") or by a third-

party domain as a result of a cross-site request made by the browser (a "third-party cookie"). Cookies are commonly used to identify individual users across sessions and, in the case of third-party cookies, across websites.

27. A "tracking pixel" (also called a "web beacon") is a small image or similar resource embedded in a web page such that, when the browser attempts to fetch it, the cross-site request itself — and the cookies, headers, and URL parameters that accompany it — communicate tracking data to the third-party server. The image content is typically irrelevant (and often one pixel wide by one pixel tall); the important function is the cross-site request triggered by the browser attempting to fetch it.

28. A "JavaScript script" (or simply "script") is a block of computer code, embedded in or linked to a web page, that executes inside the user's browser when the page is rendered. Scripts can make additional HTTP(S) requests, read and write cookies, read the HTML structure of the page, read the user's input, and perform essentially arbitrary computation. Scripts are a principal mechanism by which websites transmit user data to third parties — the script, executing inside the browser, programmatically issues cross-site requests to the third-party domains it was written to contact.

29. An "iframe" (HTML inline frame) is an element of a web page that embeds a separate, self-contained web page within the containing page. When a page contains an iframe, the user's browser loads the iframe's URL as a separate document — including making all of that document's HTTP(S) requests to its own first-party domain (which, from the user's perspective, is actually a third-party domain embedded in the parent page). iframes are a principal mechanism by which video platforms (including Vimeo) embed video players in third-party websites.

30. An "SDK" (software development kit) is a collection of scripts, iframes, pixels, and related code that a third-party commercial actor provides to website operators for embedding on their websites. SDKs typically enable the website operator to invoke the third party's services (for example, to embed a video, to display an icon, to log an analytics event) in exchange for the embedded code transmitting user data back to the third party.

31. A "User-Agent" string is a text string, transmitted in every HTTP(S) request, that identifies the type and version of the client software making the request. A typical User-Agent string for a web browser identifies the browser (e.g., "Chrome"), its version, the operating system (e.g., "Windows NT 10.0"), the platform (e.g., "Win64; x64"), and the rendering engine (e.g., "AppleWebKit/537.36"). The User-Agent string is a widely-used signal in device-fingerprinting and analytics.

32. A "Referer header" (spelled "Referer" in the HTTP specification, a historical misspelling of "Referrer") is a text string, transmitted in each HTTP(S) request made by a browser, that identifies the URL of the page from which the current request originated. For cross-site requests, the Referer header reveals to the third party the first-party page that triggered the request — in this case, it reveals that my browser was viewing drexchem.com when the cross-site request was made.

33. A "local storage identifier" (or "localStorage id") is a piece of data stored in the browser's client-side storage area associated with a specific domain. The browser permits JavaScript executing at that domain to store and retrieve such data across sessions. Local-storage identifiers are commonly used by third parties to persistently identify a browser independent of cookies (and to survive cookie-clearing).

34. A "JSONP" (JSON with Padding) request is a technique by which a web page makes a cross-site request to a third-party server and receives, in response, a JavaScript function call wrapping the requested data. Because JavaScript includes (unlike traditional HTTP requests) are not subject to the web's "same-origin policy," JSONP allows a page to receive cross-site data in contexts where standard cross-origin HTTP requests would be blocked. The clients1.google.com autocomplete requests described in this First Amended Complaint are JSONP requests: each request URL contains "callback=[name]" and "fn=[name]" parameters specifying the JavaScript callback function the page wishes Google to invoke with the response data. Google returns a JavaScript file (with Content-Type "text/javascript") containing a call to that callback function; the browser executes the returned JavaScript upon receipt, thereby delivering Google's response to the calling page.

35. A "Content Delivery Network" ("CDN") is a network of servers, operated by a CDN provider, that hosts and delivers static assets (images, CSS, JavaScript, fonts, videos) on behalf of one or more website operators. A CDN provider typically operates points of presence in multiple geographic regions, such that assets can be served from a server physically near the requesting user. CDN delivery necessarily involves cross-site requests from the first-party page to the CDN's domain, and therefore necessarily gives the CDN operator access to the user metadata described in Paragraph 25 above.

36. An "analytics endpoint" (or "telemetry endpoint") is a URL operated by a third-party commercial actor that receives HTTP(S) requests containing user-behavior data collected by embedded scripts on the third party's customer websites. The third party uses the received data to provide analytics services to the website operator (the third party's customer) and — commonly — to build a cross-site profile of the user for the third party's independent commercial purposes.

37. A "web data broker" is a commercial entity whose business model depends on the collection, aggregation, enrichment, analysis, and monetization of data about individual Internet users and consumers, including through sale of that data or of data-informed services (such as targeted-advertising services and audience segmentation). California law requires certain data brokers to register with the California Privacy Protection Agency under California's "Delete Act" (Cal. Civ. Code § 1798.99.80 et seq.).

38. A "consent management platform" or "CMP" is a third-party service that provides website operators with the infrastructure (banners, preference panels, and record-keeping systems) to collect, record, and honor visitor consent choices with respect to cookies and other tracking technologies. A CMP is itself a third-party integration: the banner and associated logic are delivered to the visitor's browser via cross-site requests to the CMP's domain, and the visitor's consent choices are typically transmitted back to the CMP's servers for record-keeping.

39. An "incognito" or "private browsing" window is a browser session that starts with no pre-existing cookies, no pre-existing local-storage data, no pre-existing cache, and no pre-existing browsing history, and that — at session end — discards any cookies, local-storage entries, and browsing history accumulated during the session. An incognito window is an appropriate testing tool for observing the data-collection behaviors of a website on a "clean" browser not confounded by pre-existing tracking cookies.

40. "Chrome Developer Tools" (sometimes called "DevTools") is a software diagnostic panel built into the Google Chrome web browser that permits a user to observe the browser's internal operation, including all HTTP(S) requests and responses, all JavaScript errors and console output, all cookies stored on the device, all local-storage entries, and a variety of related technical information. The DevTools panel is the principal technical means by which a user can

— from the visitor side — observe the tracking behaviors described in this First Amended Complaint. It is also the means by which I documented Defendant's interception architecture.

41. An "HTTP Archive" or "HAR" file is a structured JSON file that records a browser session's complete HTTP(S) request-and-response history, including request URLs, headers, query strings, POST bodies, response status codes, response headers, and (optionally) response bodies. Chrome DevTools can save a HAR file representing any session. HAR files are a standard format used by web developers and privacy researchers to document and share observations of web-application network behavior. I have preserved HAR files documenting the interception events described in this First Amended Complaint.

***B. Defendant's Website and Commercial Activities***

42. Defendant owns, operates, and controls the commercial website located at https://www.drexchem.com/, together with all of its subdomains, subdirectories, and sub-pages, including without limitation:

(a) the homepage at https://www.drexchem.com/;

(b) the "About Us" page at https://www.drexchem.com/about-us/;

(c) the "Resources" page at https://www.drexchem.com/resources/;

(d) the "Products" landing page at https://www.drexchem.com/products/;

(e) the "Product Categories" pages, including without limitation

https://www.drexchem.com/product-category/adjuvants-surfactants/,

https://www.drexchem.com/product-category/herbicides/,

https://www.drexchem.com/product-category/fungicides/,

https://www.drexchem.com/product-category/insecticides/, and

https://www.drexchem.com/product-category/turf-growth-regulators/;

(f) individual product pages, each accessible via URLs in the form https://www.drexchem.com/products/[product-slug]/;

(g) news posts and resource articles, accessible via URLs under https://www.drexchem.com/resources/;

(h) the "Testimonials" page at https://www.drexchem.com/testimonials/;

(i) the "Careers" page at https://www.drexchem.com/careers/;

(j) the "Sales Reps" page at https://www.drexchem.com/sales-reps/;

(k) the "Registration" page at https://www.drexchem.com/registration/;

(l) the "International" page;

(m) the "Privacy Statement" page at https://www.drexchem.com/privacy-statement-3/;

(n) the "Terms of Use" page at https://www.drexchem.com/terms-of-use/; and

(o) various administrative subdomains including, without limitation, the Customer Relationship Management subdomain at http://crm.drexchem.com/ and the CentreStack file-portal subdomain at https://centrestack.drexchem.com/.

43. Defendant's Website prominently displays Defendant's "Drexel" trademark, slogan ("Serving Growers Since 1972"), and branding on every page. The Website is the principal public-facing online commercial presence of Defendant's agricultural chemical manufacturing and distribution business.

44. Defendant's Website advertises and promotes more than five hundred agricultural chemical products manufactured and distributed by Defendant. The product listings include, without limitation: herbicides (such as "2,4-DB DMA 175," "2,4-DB DMA 200," and "Dicamba DGA"); horticultural spray oils and oil-based adjuvants (such as "435 Oil 98.8" and "455 Oil 98.8"); ammonium sulfate conditioning blends (such as "AMS-All" and "AMS-Supreme"); and

related products (such as the product featured on Defendant's homepage under the trade name "Foma 2.0"). More broadly, Defendant's product catalog includes pesticides, herbicides, fungicides, insecticides, adjuvants, surfactants, wetting agents, fertilizers, defoliants, desiccants, turf growth regulators, macronutrients, micronutrients, specialty products, and related agrochemical products.

45. Defendant's Website categorizes its product catalog by product type (including Adjuvants/Surfactants, Defoliants/Desiccants, Fungicides, Growth Regulators, Herbicides, Insecticides, Nutrients/Micronutrients, and Specialties) and by target crop (including Citrus, Corn, Cotton, Peanuts, Potatoes, Range & Pasture, Rice, Sorghum, Soybeans, Tobacco, Tree Fruits & Nuts, and Turf & Ornamentals). This structure demonstrates that Defendant's Website is a specialized agricultural-chemical product catalog, not a general-content publication, and that searches within that catalog necessarily communicate substantive commercial, agronomic, regulatory, or operational interest in specific active ingredients, product classes, crops, pests, or modes of action. A search for an active ingredient such as "azoxystrobin," "atrazine," "chlorothalonil," "captan," "carbaryl," "dicamba," "MSMA," "metolachlor," "fomesafen," "glyphosate," "clethodim," "imazethapyr," "tebuconazole," "malathion," "dimethoate," "lambda-cyhalothrin," or "2,4-DB" — each a well-known pesticide, herbicide, fungicide, or insecticide active ingredient — reveals the searcher's particular interest in the class of pest, disease, or weed those ingredients address; in the crops for which those ingredients are approved; and in the operational context in which the searcher is considering the ingredient's use.

46. Defendant's Website offers an on-site search bar that is prominently displayed on every page of the Website (excluding limited interstitial pages). The search bar appears in the header area of the page. In the mobile/collapsed view, the search bar is labeled with placeholder

text reading "Search here.." and is accompanied by a magnifying-glass icon indicating its function as a search tool. By the conventional design language and placement of the search bar, the search bar represents to the visitor that it is a search tool for locating products, resources, and other content within Defendant's Website.

47. Defendant's Website includes a "Resources" section where Defendant publishes news posts, product announcements, personnel announcements, regulatory updates, and related content. The Resources section includes posts such as, without limitation: "Drexel Adds West Coast Sales Representative"; "RESISTANCE MANAGEMENT – Group Numbers for Mode Of Action (MOA) on our Pesticide Products"; and similar items spanning multiple prior years.

48. Defendant's Website includes an "About Us" page. The About Us page displays a video player — embedded from the third-party Vimeo platform via an iframe — that auto-plays upon the page loading in a visitor's browser, with no affirmative action required from the visitor. The video (Vimeo video identifier 463998552) depicts aerial and ground footage of agricultural fields, crop-dusting spray equipment, and related content.

49. Defendant's Website includes a "Privacy Statement" at https://www.drexchem.com/privacy-statement-3/, which makes specific representations to visitors about Defendant's collection, use, sharing, and protection of visitors' personal information, as detailed in Section IV.I below.

50. Defendant's Website includes a "Terms of Use" page at https://www.drexchem.com/terms-of-use/.

51. The Website is built on the WordPress content management system, runs on PHP, employs Google web-analytics products, uses the Google Fonts API, and is served to visitors by way of the Cloudflare content-delivery network, among other technical infrastructure. Defendant

has actively chosen and continues to actively choose each component of this technical stack, including each of the third-party scripts, pixels, cookies, and endpoints identified herein.

### *C. The Third Parties Embedded on Defendant's Website*

52. Defendant has embedded on every page of its Website, or on substantial portions thereof, programming code that causes visitors' browsers to communicate directly with servers owned and controlled by the Third Parties. The Third Parties each receive, store, analyze, and monetize the data transmitted by visitors' browsers as a result of Defendant's deliberate embedding of that code.

53. Defendant has designed and configured its Website to cause these third-party transmissions to occur without any notice to the visitor, without any affirmative consent by the visitor, and — in the case of the pages other than https://www.drexchem.com/resources/ — without any cookie consent banner appearing at any time.

***Google LLC***

54. Google LLC ("Google") is a Delaware limited liability company, wholly owned by Alphabet Inc., with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California. Google is one of the largest technology companies in the world and operates, among other products and services, the Google Search engine, the Google Analytics web-analytics product, Google's font-delivery APIs, Google-hosted JavaScript libraries, Google's real-time bidding advertising exchanges, Google Ads, the Google Cast framework, the Google autocomplete suggestion service, and related services.

55. Google is a registered data broker with the California Privacy Protection Agency, required by law to disclose the categories of data it collects and the purposes for which it uses that data. See Cal. Civ. Code § 1798.99.80 et seq. Google's primary business model relies on the

collection, analysis, aggregation, and monetization of user data, including through targeted advertising and the sale of advertising services informed by the data Google collects.

56. In its 2024 fiscal year, Alphabet Inc. (Google's parent) reported revenue of approximately $350 billion, the vast majority of which was derived from advertising services. Google's advertising services are fundamentally data-dependent: they target advertisements based on data Google has collected about individual Internet users, including data collected from websites that embed Google's tracking technologies.

57. Defendant's Website causes visitors' browsers to communicate with multiple Google-owned domains, endpoints, and subdomains, including without limitation:

(a) clients1.google.com, which receives the contents of visitors' search queries entered into Defendant's search bar, in real time, on a per-keystroke basis, as described in Section IV.D below;

(b) fonts.googleapis.com, from which Defendant's Website loads cascading-stylesheet declarations that cause visitors' browsers, in turn, to fetch font files from fonts.gstatic.com, resulting in continuous communications between the visitor's browser and two distinct Google-controlled domains for every page view;

(c) fonts.gstatic.com, from which Defendant's Website loads font files in the Google WOFF2 format, including without limitation typefaces in the "Open Sans," "Work Sans," and "Domine" families, across multiple page loads;

(d) ajax.googleapis.com, from which Defendant's Website loads the jQuery JavaScript library at version 3.1.0;

(e) www.gstatic.com, from which Defendant's Website loads the Google Cast framework and related browser-side scripts in the context of Defendant's embedded Vimeo video player; and

(f) other Google-controlled endpoints as may be revealed in discovery.

58. When a visitor's browser communicates with any of these Google-controlled endpoints, Google receives — at a minimum — the visitor's IP address, user-agent string, referrer URL (identifying the page of Defendant's Website the visitor was on at the time), cookie identifiers (where cookies have been set), and additional metadata including but not limited to language preferences, accepted content types, and HTTP/2 or HTTP/3 signaling information.

59. Most significantly, when a visitor types text into Defendant's on-site search bar, the Website's embedded code causes each individual keystroke to generate a separate HTTPS GET request to clients1.google.com. That request is to Google's "complete/search" endpoint, which is Google's autocomplete-suggestion service. The request URL is in the form https://clients1.google.com/complete/search?q=[SEARCH STRING]&hl=en&nolabels=t&client=hp&ds=&callback=[cb]&fn=[fn] — with the contents of the visitor's in-progress search query, as typed so far, encoded into the "q=" parameter. The "callback" and "fn" parameters identify the JavaScript function that Drexel's embedded JavaScript library, "DoMini.js," has registered to process Google's response (thereby completing the JSONP pattern described in Paragraph 34 above). Thus, a visitor typing any text into the search bar necessarily transmits N separate requests to Google, where N is the number of characters in the typed text (with occasional duplicates where the browser queues rapid keystrokes).

60. Defendant's Website causes these Google transmissions to occur even when the visitor has not taken any action to submit a search, even before the visitor has finished typing a word, and even if the visitor never presses "Enter" or clicks the search icon. In technical terms, the transmissions are triggered by the "keyup," "input," or similar keyboard-input event on the search bar's input element, not by any form-submission event. The visitor has no visual indication whatsoever that each keystroke is being transmitted to a third party.

61. The Google transmissions identified above occur regardless of whether the visitor has accepted or rejected any cookie banner, and regardless of whether any cookie banner is displayed at all. They occur on pages of the Website where no cookie banner whatsoever is displayed (including the homepage at https://www.drexchem.com/ and the About Us page at https://www.drexchem.com/about-us/). They also occur on the Resources page after a visitor clicks "Reject All" on Defendant's cookie consent banner.

62. Google uses the data it receives from Defendant's Website to, among other things: (a) build and augment Google's behavioral-advertising profiles of individual Internet users; (b) serve targeted advertising across Google's advertising network (including the Google Display Network and Google Search Ads); (c) upon information and belief, augment Google's data-driven product capabilities consistent with Google's publicly disclosed data practices; (d) provide analytics services to Defendant and to other website operators who purchase such services from Google; and (e) generate revenue from targeted advertising, audience segmentation, and data-enriched commercial services.

***Vimeo, Inc. and Its Subsidiaries and Parent***

63. Vimeo, Inc. ("Vimeo") is a Delaware corporation headquartered in New York, New York. Until November 24, 2025, Vimeo was a publicly traded company listed on the Nasdaq

Stock Market under the ticker symbol "VMEO." On that date, Vimeo was acquired by and became a wholly owned subsidiary of Bending Spoons US Inc., which in turn is a wholly owned subsidiary of Bending Spoons S.p.A., an Italian joint-stock company (societá per azioni) headquartered in Milan, Italy.

64. Vimeo operates a video-hosting, video-streaming, and video-distribution platform. Vimeo's platform is free for basic use to account holders and is also used to embed videos into third-party websites — such as Defendant's Website — through Vimeo's iframe-based "Video Player."

65. Defendant's Website embeds Vimeo's Video Player on its About Us page. The embed causes a visitor's browser to communicate with Vimeo-controlled domains, including without limitation:

(a) player.vimeo.com, which hosts Vimeo's player JavaScript API (player.js) and serves the video content frame at URLs in the form https://player.vimeo.com/video/463998552?autoplay=1&loop=1 — where "autoplay=1" is a parameter that Defendant has deliberately configured and which causes the video player to begin streaming video immediately upon page load without any action by the visitor, and where "loop=1" causes the video to continuously restart and continue streaming indefinitely, with corresponding continuous telemetry transmissions;

(b) f.vimeocdn.com, from which the player loads player.module.js, vendor.module.js, player.css, and the browser-fingerprinting utility vuid.min.js;

(c) i.vimeocdn.com, which serves video thumbnail and preview images;

(d) vod-adaptive-ak.vimeocdn.com, which streams the adaptive-bitrate encoded video payload;

(e) videoapi-sprites.vimeocdn.com, which serves video "sprites" (scrubber-preview images); and

(f) Vimeo's telemetry endpoints — described in subparagraph (g) below — which receive real-time session and viewing-behavior data.

(g) Specifically, Vimeo's telemetry endpoints include arclight.vimeo.com/add/player-stats (which receives multiple in-session "player-stats" beacons as the video plays, tagged with a session-id parameter), and lensflare.vimeo.com/add/vimeo.play_video (which receives a transmission each time the video begins playback).

66. As soon as a visitor loads Defendant's About Us page, and without any notice or any action by the visitor, the following cookies — each set by the ".vimeo.com" cookie domain, meaning they are served, set, stored, and retrievable by Vimeo across any and all websites that embed Vimeo's player — are placed on the visitor's device and browser:

(a) a cookie named "__cf_bm," which is a Cloudflare "Bot Management" cookie associated with the ".vimeo.com" domain, having path "/," a size of 205 bytes, an expiration date in the future, the HttpOnly flag set, the Secure flag set, and Third-Party and Medium priority attributes;

(b) a cookie named "_cfuvid," which is a Cloudflare unique-visitor identifier cookie associated with the ".vimeo.com" domain, having path "/," a size of 120 bytes, a Session expiration, the HttpOnly flag set, the Secure flag set, SameSite set to "None," and Third-Party and Medium priority attributes; and

(c) other cookies as may be revealed in discovery.

67. I personally observed and documented the presence of these cookies on my browser's cookie store immediately after loading Defendant's About Us page in a fresh Chrome Incognito

browser session, where my browser had been "Incognito" (meaning it started with no pre-existing cookies, local-storage entries, or browsing history) and where I had not previously visited any Vimeo-operated website.

68. The presence of these third-party cookies on a visitor's device is directly attributable to Defendant's deliberate decision to embed the Vimeo player on its About Us page. Defendant could have, but chose not to, (a) host the video file on its own servers rather than on Vimeo, (b) configure the Vimeo player in "do-not-track" (DNT) mode, (c) apply Vimeo's "dnt=1" URL parameter to suppress tracking, (d) refrain from autoplaying the video, or (e) refrain from embedding a third-party player at all.

69. Further, Vimeo's player JavaScript causes the visitor's browser to execute a second, separate transmission — a POST request — to orion.bendingspoons.com/v3/identity/settings. The body of that POST transmission, as observed by me, is a JSON object containing at minimum the following fields: "is_logged_in" (a boolean), "local_storage_id" (a universally unique identifier drawn from the visitor's browser local storage), "device_type" (here, "desktop"), "vimeo_user_id" (which may be null if the visitor is not logged in to Vimeo), "vuid" (Vimeo's unique visitor identifier), "client_environment" (here, "production"), and "bsp_id" (which in the observed instance was the string "vimeo_player"). Thus, Vimeo's embedded player caused my unique and persistent browser identifier, my device type, and my session context to be transmitted to Bending Spoons. This transmission occurs without any notice or consent and before any cookie banner is presented to the visitor.

70. Vimeo uses the data it receives, including the data transmitted by my browser as a result of Defendant's embedding, to: (a) build and augment Vimeo's profile of individual Internet users; (b) serve targeted advertising and recommended content; (c) provide analytics services to

Vimeo's business customers (including, potentially, Defendant); (d) consistent with Vimeo's publicly disclosed data practices, augment its analytics and product capabilities; and (e) generate revenue from advertising, subscription-based services, and data-enriched commercial services.

***Bending Spoons S.p.A. and Bending Spoons US Inc.***

71. Bending Spoons S.p.A. is an Italian joint-stock company (societá per azioni) headquartered in Milan, Italy. Bending Spoons US Inc. is a Delaware corporation and a wholly owned subsidiary of Bending Spoons S.p.A. Together, these two entities ("Bending Spoons") form one of the largest private technology-company holding groups in Europe.

72. Bending Spoons owns and operates a portfolio of consumer and enterprise technology brands, including Vimeo (acquired November 24, 2025, for approximately $1.38 billion), WeTransfer, Evernote, Meetup, komoot, Remini, Brightcove, and Filmic, among others. Collectively, Bending Spoons companies have served more than one billion users.

73. Bending Spoons operates data-collection, identity-resolution, and analytics infrastructure at orion.bendingspoons.com — specifically including the endpoint at /v3/identity/settings. That endpoint receives identity and session data from Bending Spoons' portfolio of brands and third-party properties embedding Bending Spoons-controlled technology (including the Vimeo video player embedded on Defendant's Website).

74. The /v3/identity/settings endpoint at orion.bendingspoons.com is precisely the kind of identity-resolution service that forms the core of a modern data-broker operation. By receiving identity signals from multiple brands (Vimeo, WeTransfer, komoot, etc.) and across the broader Internet via embedded tracking, Bending Spoons can build cross-property user profiles that any one of its acquired brands — or any third-party integration — could not build alone.

75. Bending Spoons uses the data it receives from Defendant's Website — via the Vimeo embed — to, among other things, build and augment cross-property user profiles, provide analytics services, and generate revenue from data-informed commercial services, upon information and belief and consistent with Bending Spoons' known portfolio-level data-monetization business model.

***Fonticons, Inc. ("Font Awesome")***

76. Fonticons, Inc., doing business as "Font Awesome" and operating the domain use.fontawesome.com ("Font Awesome"), is a Delaware corporation that licenses and distributes icon font files to website operators.

77. Defendant's Website loads JavaScript, CSS, and font files from use.fontawesome.com on every page. Specifically, Defendant's Website causes visitors' browsers to retrieve: (a) the account-specific JavaScript bundle at https://use.fontawesome.com/db7df01f48.js (which Font Awesome associates with Defendant's account identifier "db7df01f48"); (b) the corresponding CSS file at https://use.fontawesome.com/db7df01f48.css; (c) generic Font Awesome CSS at https://use.fontawesome.com/releases/v4.7.0/css/font-awesome-css.min.css; and (d) font binary files such as https://use.fontawesome.com/releases/v4.7.0/fonts/fontawesome-webfont.woff2.

78. As a result of these transmissions, Font Awesome receives on every page load — at a minimum — the visitor's IP address, user-agent string, referrer URL (identifying the page of Defendant's Website the visitor was on), and any cookies set on the .fontawesome.com domain. Font Awesome further receives from Defendant's account-specific JavaScript bundle information concerning Defendant's usage patterns and, by inference, Defendant's visitor traffic and usage statistics.

***Update AG / browser-update.org***

79. Update AG, a Switzerland-organized entity, operates the website browser-update.org (sometimes referred to herein as "Update AG"), which distributes a JavaScript "browser updater" library widely embedded on commercial websites for the stated purpose of prompting visitors with outdated browsers to update them.

80. Defendant's Website loads and executes Update AG's JavaScript library on every page by way of a script tag referencing https://browser-update.org/update.min.js.

81. As a result, Update AG receives on every page load — at a minimum — the visitor's IP address, user-agent string, and the referrer URL of Defendant's Website page being viewed. Update AG's JavaScript executes on the visitor's device and has access to additional browser, device, and user-agent information accessible through the browser's JavaScript interfaces.

***"CookieAdmin" (Operator of Defendant's Cookie Consent Management Platform)***

82. Defendant deploys a cookie consent management platform ("CMP") on certain pages of the Website, including on the Resources page. The CMP is operated under the brand "CookieAdmin." The CMP's banner displays a "Powered by CookieAdmin" attribution at the bottom of the cookie banner shown on the Resources page.

83. Upon information and belief, the CookieAdmin CMP is a third-party service that logs visitor consent selections, device fingerprints, IP addresses, timestamps, and related metadata for compliance and auditing purposes. Defendant has chosen to deploy CookieAdmin on some pages and not on others, thus creating inconsistent consent mechanisms across Defendant's Website.

84. On each page where the CookieAdmin banner appears and on each page where it does not appear, the CMP and/or Defendant cause transmissions of visitor data to CookieAdmin's servers for CMP operational and auditing purposes.

85. Ironically, the CMP itself is a third-party tracking integration: the banner CookieAdmin displays is a JavaScript-delivered UI component that generates cross-site HTTP(S) requests to CookieAdmin's servers — meaning that even the opportunity to decline third-party tracking through the banner itself generates data that flows to a third party not previously disclosed.

***Customer Relationship Management Marketing Persistence Script (crm.drexchem.com)***

86. Defendant operates, and embeds on its Website, a marketing persistence script hosted at http://crm.drexchem.com/crm10/API/marketing/PersistenceScript?profile=drexel (the "Persistence Script"). Although the crm.drexchem.com subdomain is controlled by Defendant, the Persistence Script is architecturally a separate endpoint — running on a separate server, under a separate subdomain, operating through a separate HTTP connection, and transmitting data to a customer-relationship-management infrastructure logically distinct from the main drexchem.com web application.

87. The Persistence Script's purpose — as indicated by its name ("PersistenceScript") and endpoint path ("marketing") — is to identify, remember, recognize, track, and persistently associate a visitor's browsing session with a CRM marketing profile. The Persistence Script's "profile=drexel" URL parameter indicates that the script associates the visitor's browsing with Defendant's CRM profile.

88. The HAR file I recorded during my visits to Defendant's Website captures repeated requests to the Persistence Script endpoint. The presence of a marketing-persistence script on a subdomain dedicated to customer-relationship-management logic supports the inference that Defendant designed its Website architecture to track, identify, profile, and market to visitors

across pages, sessions, and visits — in particular, to associate anonymous website-browsing activity with identifiable customer or prospect records in Defendant's CRM system.

89. Upon information and belief, the Persistence Script captures at least the visitor's IP address, User-Agent string, Referer header, and session identifiers, and — where the visitor has a pre-existing CRM record — associates the browsing session with that record. The Persistence Script effectively functions as a first-party tracking pixel dedicated to cross-session visitor identification for marketing purposes, operating alongside and independent of the third-party trackers described in the preceding subsections.

90. Defendant did not disclose the presence or operation of the Persistence Script in its Privacy Statement, in its Terms of Use, in the CookieAdmin banner, or anywhere else on the Website. The Persistence Script continued to operate on my visits after I clicked "Reject All" on the CookieAdmin banner.

***First-Party Tracking ("_sfs_id")***

91. In addition to the third-party tracking described above, Defendant's Website sets a first-party cookie named "_sfs_id" on the drexchem.com domain. This cookie has a size of 49 bytes, a path of "/," an expiration date set in the future, and the Secure flag set.

92. Upon information and belief, the "_sfs_id" cookie is a unique device- or session-identifier cookie used by Defendant to track individual visitors across pages of the Website and across return visits. The cookie is placed on visitors' devices at the moment of the first page load of the Website, without notice or consent.

93. Defendant uses this first-party identifier to track my activities on the Website, to aggregate that activity with data received from the Third Parties' tracking infrastructure, and to build a persistent record of my interactions with Defendant's Website.

### *D. The Contemporaneous Keystroke-Level Interception of My Search Queries — Detailed Technical Analysis*

94. Defendant's Website contains a search bar on every page (excluding certain interstitial pages). The search bar appears in the header area of the page. In the mobile/collapsed view, the search bar is labeled with placeholder text reading "Search here.." and is accompanied by a magnifying-glass icon indicating its function as a search tool for locating content within Defendant's Website.

95. Defendant has chosen to implement the search bar's input-handling logic using a JavaScript library called "DoMini" (or "DoMini.js"), which is an AJAX helper library. The search bar's input-handling code — which I identify through the JavaScript "callback" and "fn" parameter names visible in the HTTP requests — is configured such that each keystroke event on the search bar's input element triggers an AJAX call by DoMini. Each AJAX call, in turn, makes an HTTPS GET request not to Defendant's own server but, instead, to clients1.google.com — a subdomain wholly owned and operated by Google LLC.

96. The precise form of each such request is well-documented. Each request URL takes the form:

https://clients1.google.com/complete/search?q=[SEARCH STRING]&hl=en&nolabels=t&client=hp&ds=&callback=DoMini.fn.ajax_cb_[UNIQUE_HASH]&fn=ajax_cb_[UNIQUE_HASH]

where:

(a) the "q" parameter carries the actual text of my in-progress search query, exactly as typed into the search bar up to the moment the request was generated;

(b) the "hl" parameter, always "en," identifies the requested response language as English;

(c) the "nolabels" parameter, always "t" (true), instructs Google to return unlabeled completions;

(d) the "client" parameter, always "hp," identifies to Google the Google client-type profile for this request (the "hp" client profile corresponds to "homepage" — a stateless autocomplete client);

(e) the "ds" parameter is empty, indicating no data-source filter;

(f) the "callback" parameter provides the fully-qualified JavaScript callback-function name (e.g., "DoMini.fn.ajax_cb_71a94919a04a4edc83c2bf3cccc99388") that the DoMini library will register to process Google's response; and

(g) the "fn" parameter duplicates the callback function's short name (e.g., "ajax_cb_71a94919a04a4edc83c2bf3cccc99388").

97. The purpose of the "callback" and "fn" parameters is to implement JSONP (JSON with Padding) — the technique described in Paragraph 34 above that permits a web page on one domain (drexchem.com) to receive data, cross-origin, from a different domain (clients1.google.com) by executing the response as a JavaScript file. In effect, each such request is not merely a data fetch; it is an explicit invitation by Defendant's Website for Google to return JavaScript code that will execute inside the visitor's browser. That JavaScript, generated by Google in response to the request and executed by the visitor's browser, delivers Google's autocomplete suggestions to Defendant's search-bar input — while simultaneously (and critically) allowing Google to record, in its server logs, every element of the request, including my in-progress search query.

98. Each of these HTTPS GET requests includes, in its HTTP headers, at a minimum:

(a) Referer: https://drexchem.com/ — confirming to Google that the request originated on Defendant's Website (and, in each particular instance, from a specific page of Defendant's Website);

(b) User-Agent: a full string identifying the visitor's browser, operating system, and platform (in my case, a string identifying my browser as Google Chrome on Windows);

(c) sec-ch-ua: a string identifying the User-Agent "Client Hints" (including the specific Chromium-family browser variant);

(d) sec-ch-ua-platform: "Windows" (or equivalent for other operating systems);

(e) sec-fetch-site: "cross-site" — a browser-generated header confirming that this is a cross-origin request (from drexchem.com to clients1.google.com);

(f) sec-fetch-mode: "no-cors" — indicating the JSONP / no-CORS request pattern;

(g) accept: "*/*" — accepting any content type; and

(h) the visitor's IP address, transmitted at the TCP/IP layer with each request.

99. Google responds to each such request with an HTTP 200 OK response, a "Content-Type: text/javascript; charset=UTF-8" header, and a response body containing JavaScript code that, when executed by the visitor's browser, invokes the "callback" function identified in the request, passing in Google's autocomplete suggestions for the query. The HTTP response also includes Google's "Content-Disposition: attachment; filename='f.txt'" header (a standard Google autocomplete-service header), a "Cache-Control: private, max-age=3600" header (indicating the response is user-specific and can be privately cached), and a lengthy "Content-Security-Policy" header.

100. On information and belief, Google's infrastructure logs and stores each such request — including the full request URL (with the "q" parameter carrying the in-progress search query),

the Referer header, the User-Agent header, the IP address, and all other request metadata — in Google's server logs. These logs are indexed, retained, and used by Google for the commercial purposes described in Paragraph 62 above, including to augment Google's behavioral-advertising profile of the requesting browser and individual, to serve targeted advertising, and to support Google's data-driven advertising and analytics services consistent with Google's publicly disclosed data practices.

101. The significance of the DoMini/JSONP architecture — from a privacy-law standpoint — cannot be overstated. Defendant did not merely cause visitors' search queries to be incidentally logged by some background tracker. Defendant caused every single keystroke entered into its search bar to be actively, explicitly, and willfully transmitted to Google, with an explicit callback mechanism inviting Google to deliver responsive JavaScript to be executed inside the visitor's browser. The transmission of the contents of my in-progress communications to Google is not an accidental byproduct of the architecture; it is the architecture's core function.

102. Moreover, Defendant's embedded DoMini.js script is not a passive widget Defendant "happens" to host. It is an actively-invoked script that implements a precise cross-site request pattern conforming to Google's autocomplete endpoint protocol — including the specific combination of the "q," "hl," "nolabels," "client=hp," "ds," "callback," and "fn" parameters that Google's autocomplete endpoint requires to respond. This is a deliberate integration, implemented to a specific Google-defined protocol, with a specific Google-defined parameter format.

***E. Forensic Documentation of the Keystroke-Level Interception***

103. During the relevant period, I accessed Defendant's homepage at https://www.drexchem.com/ from my personal computer located in Los Angeles County,

California, in order to make a clean forensic record of the keystroke-level interception architecture I had previously observed. My browser was Google Chrome, operating on Windows 10, in an "Incognito" (private browsing) mode, started with no pre-existing cookies, no pre-existing local-storage entries, and no pre-existing browsing history. I opened Chrome Developer Tools with the "Network" panel active, filtered to capture all requests matching the string "CALIFORNIA," and began recording with the "Preserve log" option enabled.

104. I typed a multi-character forensic test string into Defendant's on-site search bar, one character at a time. I typed each character intentionally and deliberately, to produce a clean, attributable record of the Website's keystroke-level interception architecture.

105. The HAR file I saved from Chrome DevTools during this session records, in pertinent part, the following cross-site HTTPS GET requests made by my browser during that session:

(a) Request 1, initiated at 11:48:53.460 UTC: URL = https://clients1.google.com/complete/search?q=CALIFORNIA&hl=en&nolabels=t&client=hp&ds=&callback=DoMini.fn.ajax_cb_71a94919a04a4edc83c2bf3cccc99388&fn=ajax_cb_71a94919a04a4edc83c2bf3cccc99388 — transmitting to Google the search string "CALIFORNIA." Response: HTTP 200 OK, Content-Type: text/javascript; charset=UTF-8.

(b) Request 2, initiated at 11:48:53.476 UTC (sixteen milliseconds after Request 1): URL transmitting to Google the search string "CALIFORNIA" with a different JSONP callback hash (DoMini.fn.ajax_cb_fe2b795b7c8c4521aa7904ccaea4a1cc). Response: HTTP 200 OK. This duplicate is an artifact of the rapid-keystroke handling of the DoMini library, which issues a second AJAX call to confirm the user's entry.

(c) Request 3, initiated at 11:48:57.853 UTC: URL transmitting to Google the search string "CALIFORNIA1" — reflecting the addition of the character "1" to the typed-so-far string. Response: HTTP 200 OK.

(d) Request 4, initiated at 11:49:00.037 UTC: URL transmitting to Google the search string "CALIFORNIA12." Response: HTTP 200 OK.

(e) Request 5, initiated at 11:49:01.485 UTC: URL transmitting to Google the search string "CALIFORNIA123." Response: HTTP 200 OK.

(f) Request 6 (visible in the contemporaneous screenshot, but not captured in this particular HAR file segment due to when I stopped recording): URL transmitting to Google the cumulative search string up to and including the final character typed.

106. Every one of these requests carried the Referer header "https://drexchem.com/" — proving conclusively that each cross-site request was triggered by code running on Defendant's Website.

107. Every one of these requests carried the header "sec-fetch-site: cross-site" — the browser's own built-in identification of this request as one crossing between the drexchem.com first-party domain and the clients1.google.com third-party domain.

108. Every one of these requests received an HTTP 200 OK response from Google — meaning Google successfully received my in-progress search string, successfully processed it, and successfully returned autocomplete data.

109. Contemporaneously with these requests, my browser was simultaneously running Defendant's own search-bar JavaScript, which ultimately returned to me — after the typing was complete — the on-screen message: "No results!" In other words, although Drexel's own search index returned no product results matching the test string I had typed, Google had nonetheless

received and processed every keystroke of that string. The search bar's function, at least with respect to the third-party Google interception, was completed regardless of whether Defendant's own search system had any responsive data.

110. This forensic record conclusively establishes three critical facts:

(a) First: Defendant's Website does, in fact, cause each keystroke entered into its search bar to be transmitted to Google via clients1.google.com. This is not a theoretical allegation; it is an observed, recorded, HAR-preserved fact.

(b) Second: The transmission happens in real time, contemporaneously with the typing of each character. The timestamps recorded in the HAR file show the requests being initiated within a few seconds of each other as I typed; the gap between Requests 2 (at 11:48:53.476Z) and 3 (at 11:48:57.853Z) is the time I took to begin typing the next character after the first word was complete.

(c) Third: The transmission occurs regardless of whether Defendant's own on-site search system has any matching content. The HAR data and the "No results!" message contemporaneously shown on Defendant's search bar prove that the transmission to Google is not ancillary to Defendant's own search functionality; it is its own architectural choice, serving Google's interests, not the visitor's.

111. The HAR file also independently confirms the "No results" problem. In that session, the test string I typed was deliberately not a product name — its non-responsive character was confirmed by Defendant's own search system returning no result. Yet Defendant's Website still transmitted each keystroke of that test string to Google, multiple times over, without returning any on-site result. The transmission to Google happens for every keystroke, regardless of the nature of the query.

112. I had previously documented substantially identical interception behavior on November 7, 2025. On that date, I accessed Defendant's homepage from my computer in Los Angeles County and typed a five-character search query into the search bar. My browser's Network panel, as preserved by my contemporaneous screenshot, showed that typing had triggered at least three separate cross-site GET requests to clients1.google.com, each with the typed-so-far string in the "q=" parameter. The screenshot also shows the Request URL, Request Method (GET), Status Code (200 OK), Remote Address (Google's server IP 163.5.185.102:12323, which is a Google-operated IP address), Referrer Policy (strict-origin-when-cross-origin), and a constellation of other technical attributes — all consistent with, and reinforcing, the forensic record I subsequently captured.

113. Further, on a separate occasion during the relevant period, I accessed Defendant's Resources page in Incognito Chrome, observed the CookieAdmin banner, and clicked "Reject All." I then navigated within Defendant's Website and again used the search bar on other pages. The keystroke-level interception continued notwithstanding my "Reject All" election, confirming that the CookieAdmin banner is ineffective as against the most significant category of Defendant's interception practice.

***F. Contrary to What One Might Reasonably Assume***

114. Contrary to what one might reasonably assume about an on-site "search bar" operated by a commercial website, the keystrokes I entered into Defendant's search bar were not — in the first instance, and without additional user action — being transmitted to Defendant's own search indexing system to generate search results. Rather, every keystroke was being transmitted to a third party (Google) for Google's own commercial purposes, while I remained unaware that this was occurring.

115. A reasonable user of a commercial website's on-site search bar expects the following: (a) text typed into the search bar will be submitted to the website's own search system when the user signals submission (by pressing Enter or clicking the search icon); (b) that submission will cause the website to query its own content indexes and return results; (c) no other party will receive the contents of the search query without affirmative notice and consent; and (d) the mere act of typing characters into the search bar, without submission, will not generate any cross-site data transmission to a third party.

116. Each of these reasonable expectations is defeated by Defendant's architecture. (a) Text is transmitted to a third party (Google) regardless of whether the user intends to submit; (b) the transmission is not conditioned on, or initiated by, any search-submission action; (c) Google — a massive data broker and advertising company — receives the full, in-progress contents of the query on each keystroke; and (d) no notice or consent is ever given for these cross-site transmissions.

117. Because Defendant's Website transmits every keystroke to Google via the Google autocomplete endpoint, Google receives a continuous, high-granularity record of what I typed, when I typed it, the timing between keystrokes, my hesitations and deletions, my autocomplete choices, and my eventual search query. This is substantially more sensitive than a mere record that I "searched for X" — it is a record of my exact cognitive process, including drafts, edits, reconsiderations, deletions, and incomplete thoughts. Google stores and uses these granular signals to build detailed profiles of individual Internet users.

118. Upon information and belief, the interception of my keystrokes through this architecture occurs on every visit to Defendant's Website in which a visitor types any text into the on-site search bar. Upon information and belief, the same architecture has been in place on

Defendant's Website during the entirety of the period from November 7, 2024 to the present, during which time I visited Defendant's Website on multiple occasions and used the search bar on multiple occasions to enter multiple different queries.

119. I specifically estimate that I used Defendant's search bar to submit searches on at least fifteen separate occasions during the period from November 7, 2024 to November 7, 2025, including on November 7, 2025. Each such occasion involved typing multiple characters into the search bar — resulting in a cumulative total of hundreds of individual interception events.

120. The substantive privacy harm I have suffered flows from my non-test searches into Defendant's product catalog and Website during the relevant period, which involved repeated, intentional searches for and inquiries into specific regulated pesticide active ingredients, agricultural chemical product categories, formulation and regulatory information, and related substantive commercial, regulatory, and investigative subjects. By way of representative example, my non-test searches included queries for active ingredients such as azoxystrobin, atrazine, chlorothalonil, captan, carbaryl, dicamba, MSMA, metolachlor, fomesafen, glyphosate, clethodim, imazethapyr, tebuconazole, malathion, dimethoate, lambda-cyhalothrin, and 2,4-DB; and queries for specific Drexel product names and formulations. These were substantive searches reflecting my private commercial, agronomic, regulatory, safety, and product-research interests — including, for example, my interest in particular fungicide active ingredients in connection with personal-use evaluation and educational research, my interest in herbicide formulations and labeled-crop applications, and my interest in the regulatory and safety profile of specific insecticide active ingredients. Each typed character of each such ingredient or product-name query generated a separate outbound HTTPS request to clients1.google.com transmitting the cumulative in-progress search string. Disclosure of these search-query contents to Google

revealed the substance of my private research into regulated agricultural-chemical ingredients and products — material categorically different from observation of ordinary website browsing, because it disclosed not merely that I was browsing a website but the specific regulated-chemical subjects I was researching, in an order and pattern reflecting the iterative course of my investigation.

121. I never intended or consented for Google — or any third party — to receive any of the text I typed into Defendant's search bar, in any form. I reasonably understood the search bar to be an on-site search tool, operated by and for the Website on which it appeared, such that text entered into it would be transmitted to Defendant's own server for Defendant's own search indexing — not transmitted to Google.

122. Defendant's Website did not disclose — to me, or to other visitors, anywhere — that its search bar was wired to transmit each keystroke to Google. Defendant's Website did not display any notice, disclaimer, banner, or other statement identifying clients1.google.com or any Google autocomplete service as a recipient of my search queries. The transmissions were architectural and concealed.

***G. The Autoplay of the Embedded Vimeo Video and the Accompanying Transmissions***

123. On or about November 7, 2025, and on prior occasions during the period from November 7, 2024 to the present, I visited Defendant's About Us page at https://www.drexchem.com/about-us/.

124. Immediately upon my loading of the About Us page in a fresh browser session — and without any action by me beyond typing the URL into my browser's address bar and pressing Enter — Defendant's Website caused a Vimeo-hosted video to begin autoplaying on the

page. The video depicts, among other things, rotating aerial and ground views of agricultural fields, with crop-spraying equipment visible across a horizon of farm imagery.

125. The autoplay was not triggered by my click, by my hover, by my scroll, or by any other affirmative act on my part. The autoplay was triggered and caused by Defendant's deliberate configuration of the Vimeo embed with the "autoplay=1" URL parameter (and, separately, the "loop=1" parameter, which caused the video to continuously restart and continue streaming indefinitely during my visit to the page).

126. As soon as the About Us page loaded and the Vimeo player initialized, my browser began making a cascade of HTTPS requests to Vimeo's servers — requests that I did not initiate and that I had no reasonable means to prevent — for the Vimeo player JavaScript (player.vimeo.com/api/player.js), the Vimeo video frame itself (player.vimeo.com/video/463998552?autoplay=1&loop=1), the Vimeo player module scripts (f.vimeocdn.com/p/4.46.43/js/player.module.js and vendor.module.js), the Vimeo player CSS (f.vimeocdn.com/p/4.46.43/css/player.css), Vimeo's visitor-unique-identifier utility script (f.vimeocdn.com/js_opt/modules/utils/vuid.min.js), a video thumbnail image (i.vimeocdn.com), adaptive-bitrate video streams (vod-adaptive-ak.vimeocdn.com), and video scrubber-preview sprites (videoapi-sprites.vimeocdn.com).

127. Simultaneously, my browser began sending beacon transmissions to Vimeo's telemetry endpoints: POST requests to arclight.vimeo.com/add/player-stats (identified by session-id parameter "5c05972b7f8972601d6badf4c2b3ed9f8bbf447b1777000862" for my session), with additional player-stats beacons at regular intervals throughout the video's autoplay and looping; and a POST request to lensflare.vimeo.com/add/vimeo.play_video upon the initiation of video playback.

128. Each of these transmissions conveyed to Vimeo — at a minimum — my IP address, my user-agent string (identifying my browser as Google Chrome running on Windows 10), my referrer URL (confirming I was viewing Defendant's About Us page), my browser session, and time-stamped information regarding my playback session.

129. On at least one occasion during the relevant period, subsequent to Vimeo's November 24, 2025 acquisition by Bending Spoons, when the Vimeo player initialized, Vimeo's JavaScript sent a POST request to orion.bendingspoons.com/v3/identity/settings. The request Origin and Referer headers identified player.vimeo.com (thus identifying my visit to a Vimeo-embedded page). The body of the request was a JSON payload:
{"is_logged_in":false,"local_storage_id":"6be68a5a-bd02-447c-aaff-e85360561aeb","device_type":"desktop","vimeo_user_id":null,"vuid":null,"client_environment":"production","bsp_id":"vimeo_player"}.

130. The "local_storage_id" value in that payload (6be68a5a-bd02-447c-aaff-e85360561aeb) is a universally unique identifier that identifies me — or, more precisely, my browser profile and session — across Bending Spoons' network of embedded player instances. By reason of Defendant's embed, Bending Spoons has learned (a) that a visitor with that unique identifier has visited Defendant's About Us page, (b) that visitor's device type, IP address, and user-agent, and (c) additional information about that visitor's behavior.

131. Before my viewing of Defendant's About Us page ended, my browser had sent additional POST beacons to arclight.vimeo.com at regular intervals, conveying playback progress and session timing data. These beacons were sent regardless of whether I was actively watching the video.

132. The HTTP Archive ("HAR") file I captured from my browser's Network panel during this session records the foregoing transmissions. In my HAR file alone, I count at least eleven distinct requests to vod-adaptive-ak.vimeocdn.com (each streaming a different video segment), at least five separate POST requests to arclight.vimeo.com/add/player-stats, at least one POST to lensflare.vimeo.com/add/vimeo.play_video, at least one POST to orion.bendingspoons.com/v3/identity/settings (preceded by an OPTIONS preflight request), and numerous supporting requests to player.vimeo.com, f.vimeocdn.com, and i.vimeocdn.com.

***H. The Ineffective Cookie Consent Banner on the Resources Page and Defendant's Disregard of My "Reject All" Selection***

133. During the relevant period, I visited Defendant's Resources page at https://www.drexchem.com/resources/ from my computer located in Los Angeles County, California, using the Google Chrome web browser running in "Incognito" (private browsing) mode. My Incognito session began with no pre-existing cookies, no pre-existing local storage data, no pre-existing browsing history, and no pre-existing sign-in state to any third-party service.

134. Upon loading of the Resources page, and before I had taken any action on the page, Defendant's Website displayed a popup cookie consent banner in the lower-left corner of my browser viewport. The banner was generated by the "CookieAdmin" consent management platform (CMP), as indicated by the "Powered by CookieAdmin" attribution at the bottom of the banner. The banner appears as follows:




135. The banner presented three buttons beneath this text: "Customize," "Reject All," and "Accept All." The "Accept All" button was visually highlighted in blue, indicating it was the recommended or default action; the "Reject All" and "Customize" buttons were displayed in a less-prominent black-text-on-white format.

136. I viewed the banner, read it in full, and clicked "Reject All." I reasonably believed — based on the plain text of the banner — that by clicking "Reject All" I was declining to consent to all non-essential cookies, and I reasonably believed Defendant would honor my rejection and would not continue to permit non-essential cookies, tracking technologies, or third-party data transmissions to occur during my session.

137. That belief was reasonable because the banner's plain language said so: clicking "Reject All" was represented to me as sufficient to "decline non-essential cookies." My election was made in reliance on that representation.

138. Despite my express election, and contrary to Defendant's representation, Defendant's Website did not honor my rejection. Within moments of my clicking "Reject All," and continuing throughout my session on the Resources page and on pages I subsequently visited within Defendant's Website, the following non-essential tracking and data-transmission activities continued to occur:

(a) My browser continued to communicate with Google's domains, including fonts.googleapis.com, fonts.gstatic.com, ajax.googleapis.com, and www.gstatic.com, transmitting my IP address, user-agent, and referrer information to Google;

(b) If I navigated from the Resources page to the About Us page, the Vimeo autoplay architecture described above engaged, transmitting my device and session metadata to Vimeo and Bending Spoons;

(c) If I used the Website's search bar at any point during my session, the keystroke-by-keystroke transmissions to clients1.google.com continued to occur (transmitting each character of my search to Google in real time);

(d) My browser continued to communicate with Font Awesome at use.fontawesome.com, transmitting my IP address, user-agent, and referrer to Font Awesome;

(e) My browser continued to communicate with browser-update.org, transmitting my IP address, user-agent, and referrer to Update AG;

(f) Defendant's first-party "_sfs_id" cookie continued to be placed and used.

139. In short, my election of "Reject All" on the CookieAdmin banner was a false promise. Defendant had architected the Website such that substantially all of the third-party tracking transmissions I was attempting to decline would continue notwithstanding my election.

140. Furthermore, the banner itself was materially deceptive because: (a) it was presented only on the Resources page and not on every page of the Website — so a visitor who navigated directly to the homepage, the About Us page, a Product page, or any other page of the Website would never see it and would therefore never be given the opportunity to decline third-party tracking; (b) even on the page where it was presented, the banner appeared only after the page had already loaded, by which time the Vimeo cookies (on the About Us page) and substantially all of the Google transmissions had already occurred; and (c) the "Reject All" option did not, in fact, reject the third-party cookies and tracking described above — meaning the banner's central promise was false.

141. I further observed that, when I loaded Defendant's About Us page in an Incognito browser session and before I had interacted with any cookie banner whatsoever, my browser was placed in possession of three cookies: the Vimeo "__cf_bm" cookie (".vimeo.com" domain), the Vimeo "_cfuvid" cookie (".vimeo.com" domain), and Defendant's own "_sfs_id" cookie (drexchem.com domain). That is, three cookies were placed on my device before any opportunity to consent or decline was ever presented. Because the Vimeo cookies are placed by way of the Vimeo player embedded on the About Us page, those cookies travel with the browser session and persist across subsequent navigation to other pages of the Website (including the Resources page) within the same Incognito browser session, even though the CookieAdmin banner does not appear on the About Us page itself.

### *I. Defendant's Material Misrepresentations in Its Privacy Statement*

142. Defendant publishes on its Website a "Privacy Statement" accessible at https://www.drexchem.com/privacy-statement-3/. The Privacy Statement is a public-facing

document that Defendant represents governs Defendant's collection, use, disclosure, and retention of visitors' personal information.

143. The Privacy Statement represents, in its opening paragraph, that: "Drexel Chemical Company is committed to protecting your privacy and developing technology that gives you the most powerful and safe online experience. This Statement of Privacy applies to the Drexel Chemical Company website and governs data collection and usage."

144. The Privacy Statement represents that: "Drexel Chemical Company does not sell, rent or lease its customer lists to third parties."

145. The Privacy Statement represents that: "Drexel Chemical Company may, from time to time, contact you on behalf of external business partners about a particular offering that may be of interest to you. In those cases, your unique personally identifiable information (e-mail, name, address, telephone number) is not transferred to the third party."

146. The Privacy Statement represents that: "In addition, Drexel Chemical Company may share data with trusted partners to help us perform statistical analysis, send you email or postal mail, provide customer support, or arrange for deliveries. All such third parties are prohibited from using your personal information except to provide these services to Drexel Chemical Company, and they are required to maintain the confidentiality of your information."

147. The Privacy Statement represents that: "Drexel Chemical Company does not use or disclose sensitive personal information, such as race, religion, or political affiliations, without your explicit consent."

148. Each of the representations quoted in Paragraphs 143 through 147 is false and misleading. Defendant's Website in fact delivers to the Third Parties — including Google, Vimeo, and Bending Spoons — the contents of my and other California visitors' electronic

communications, visitors' device identifiers, visitors' IP addresses (which are sensitive personal information under California law), visitors' search queries (which reveal interests, preferences, and, by the granularity of keystroke-level tracking, potentially sensitive or health-related concerns), and visitors' browsing and viewing behaviors. The Third Parties are not "prohibited from using [this information] except to provide these services to [Defendant]"; on the contrary, the Third Parties (particularly Google, Vimeo, and Bending Spoons) use this information for their own independent commercial purposes, including upon information and belief, the construction of cross-site behavioral profiles and the provision of data-informed advertising and analytics services. Further, the Third Parties are not subject to any confidentiality obligation enforceable against them on behalf of Defendant's visitors.

149. Defendant's representation that it "does not sell, rent or lease its customer lists to third parties" is particularly misleading because, by permitting Google and other Third Parties to intercept visitor data at the page-view and keystroke level, Defendant has effectively supplied the Third Parties with the functional equivalent of — indeed, more detailed data than — a traditional "customer list." Defendant has simply chosen to accomplish this result through technical architecture rather than through a traditional spreadsheet hand-off.

150. The Privacy Statement does not disclose, mention, or otherwise notify visitors of the following material facts: (a) that Defendant's on-site search bar transmits each keystroke to Google in real time; (b) that Defendant's About Us page autoplays a Vimeo-hosted video and that doing so causes visitor metadata to be transmitted to Vimeo and Bending Spoons; (c) that Defendant's Website places third-party cookies on visitor devices before any cookie consent banner is displayed; (d) that Defendant's cookie consent banner on the Resources page does not in fact prevent the non-essential tracking described above from continuing after a "Reject All"

election; (e) that Defendant permits Google, Vimeo, Bending Spoons, Font Awesome, Update AG, and other Third Parties to receive visitor IP addresses, user-agent information, referrer URLs, session identifiers, and (in the case of Google and the search bar) keystroke-level contents of visitor communications; and (f) that Defendant does not in fact obtain any contractually enforceable "confidentiality" commitments from the Third Parties on behalf of Defendant's visitors.

151. Defendant's representations, and Defendant's silence, were material to my decision to use Defendant's Website. Had I known, at the time of my first visit to Defendant's Website, any of the material facts set forth in Paragraph 150, I would not have used Defendant's Website, I would not have typed any search query into Defendant's on-site search bar, and I would not have visited Defendant's About Us page. Instead, I would have either abstained from using the Website or, at a minimum, would have interacted with the Website in a manner specifically designed to avoid the interception events that in fact occurred.

***J. The Private Communications Collected***

152. Through the interception architecture described above, Defendant and the Third Parties have, at a minimum, tracked and collected the following categories of information concerning me and concerning other visitors to Defendant's Website — collectively referred to herein as "Private Communications":

(a) search queries typed by the visitor into Defendant's on-site search bar, including each keystroke and each successive in-progress state of that query;

(b) the pages of Defendant's Website visited by the visitor, including the full URL path of each page;

(c) the time, duration, and frequency of each visit to each page;

(d) the visitor's in-page behaviors, including scroll depth, clicks, video playback events, and timing thereof;

(e) the visitor's IP address and derived geolocation information;

(f) the visitor's browser type, version, and operating system (as revealed by the User-Agent string);

(g) the visitor's referrer URL — identifying the site or page the visitor arrived from;

(h) the visitor's unique browser-session identifiers, including Vimeo's "vuid," the Bending Spoons "local_storage_id" value, and Defendant's first-party "_sfs_id" value;

(i) the visitor's cookie values set by the Third Parties on domains such as .vimeo.com;

(j) the visitor's language preferences;

(k) the visitor's video-viewing and engagement behaviors with respect to the Vimeo-embedded video on the About Us page;

(l) the visitor's autocomplete suggestions and interactions with Google's autocomplete service (a byproduct of the search-bar architecture);

(m) demographic information, interests, and preferences that the Third Parties can infer or retrieve from the foregoing, together with data the Third Parties have previously collected about the visitor from other websites that share in the Third Parties' tracking infrastructure;

(n) user identifiers, including any identifiers the Third Parties have previously assigned to the visitor;

(o) device information; and

(p) session information.

153. The Private Communications are "contents" of visitor communications within the meaning of 18 U.S.C. § 2510(8), California Penal Code § 631(a), to the extent they include search queries, page-specific URL paths, and in-page behavioral signals that reveal the substance, purport, or meaning of the visitor's communications with the Website. They are not "mere record information."

***K. The Commercial Value of the Private Communications***

154. The Private Communications have substantial and quantifiable commercial value. Personal data — including browsing history, search queries, device identifiers, and behavioral signals — is recognized by courts, economic scholarship, and commercial practice as a form of currency in the modern digital economy.

155. The commercial value of personal data is reflected in, among other metrics: (a) the market capitalization and revenue of the data-broker industry, including the multi-billion-dollar valuations of Google, Vimeo (acquired for $1.38 billion in November 2025 largely on the strength of its user-data holdings), and Bending Spoons' broader portfolio; (b) empirical studies quantifying consumers' willingness to accept compensation for data-sharing or to pay to protect their data; (c) the market for targeted-advertising placements dependent on such data; and (d), upon information and belief, the prices paid in advertising marketplaces for inventory targeted using the categories of data at issue here.

156. By permitting and facilitating the Third Parties' interception of my Private Communications, Defendant has effectively transferred something of substantial commercial value — my personal data — to the Third Parties without providing me with compensation, notice, or a meaningful opportunity to decline.

157. I am both (a) personally interested in the agricultural chemical products and resources offered on Defendant's Website, and (b) a privacy-conscious Internet user who values and takes steps to protect his personal information. I regularly decline cookies and reject tracking technologies when given a meaningful opportunity to do so. I would have done so with respect to Defendant's Website had Defendant provided me with a meaningful opportunity to do so. The fact that Defendant did not provide such an opportunity — and that Defendant affirmatively misrepresented in its Privacy Statement and in its cookie banner that it had — caused the interception of my Private Communications that I would otherwise have avoided.

***L. My Experiences***

158. On November 7, 2025, while located in Los Angeles County, California, I accessed Defendant's Website at https://www.drexchem.com/ from my personal computer using the Google Chrome web browser. I visited the Website to research agricultural chemical products available from Defendant and their ingredient composition. I navigated to multiple pages of the Website, including the homepage, the Products page, certain Product Category pages, individual product pages, and the About Us page.

159. During this November 7, 2025 visit, I typed one query and multiple ingredient names into the Website's on-site search bar. I typed at least twenty distinct ingredient names into the search bar, attempting to locate products containing specific active ingredients of interest to me. The search bar did not return matching products for any of those ingredient queries.

160. Each keystroke I typed into the search bar generated, in real time and without my knowledge at the time, a separate outbound HTTPS request to clients1.google.com transmitting my in-progress search query to Google.

161. During this same November 7, 2025 visit, I visited Defendant's About Us page. The page autoplayed the Vimeo-embedded video (Vimeo video identifier 463998552) without any action on my part. The autoplay triggered the transmissions to Vimeo and Bending Spoons described in Section IV.G above.

162. I also visited Defendant's Resources page on that date and on additional occasions during the relevant period. On one such occasion, while located in Los Angeles County, California, I visited the Resources page at https://www.drexchem.com/resources/ using the Chrome browser in Incognito mode. I was presented with the CookieAdmin cookie consent banner previously described in this pleading. I clicked "Reject All" in reliance on Defendant's representation that doing so would "decline non-essential cookies."

163. Despite my "Reject All" election, Defendant's Website continued to engage in the third-party data-sharing activities described in Paragraphs 132-134 above.

164. On a further occasion during the relevant period, I again accessed Defendant's Website from my computer located in Los Angeles County, California, using the Chrome browser in Incognito mode. On that occasion, I verified — by direct inspection of my browser's cookie store after loading the About Us page — that the Vimeo "__cf_bm" and "_cfuvid" cookies on the .vimeo.com domain, and Defendant's first-party "_sfs_id" cookie on the drexchem.com domain, were each placed on my device before any consent opportunity whatsoever. I preserved a screenshot of this cookie-placement observation.

165. On another occasion during the relevant period, I returned to Defendant's homepage to create a deliberate, clean forensic record of the keystroke-level interception of search-bar communications. As described in Section IV.E above, I typed a multi-character test string one

character at a time and recorded the HAR file showing each keystroke triggering a separate cross-site HTTPS GET request to clients1.google.com.

166. In addition to the specifically-dated visits above, I accessed Defendant's Website on multiple additional occasions during the period from November 7, 2024 through the present. I estimate that I accessed the Website on at least fifteen separate occasions in that period, each time from my computer located in Los Angeles County, California. During each such visit, I used the Website's search bar at least once; each such use generated multiple keystroke-level interception events as described above.

167. At no time during any of my visits did Defendant provide me with clear and conspicuous notice that my search queries would be transmitted to Google on a per-keystroke basis; that my visit to the About Us page would cause my device and session metadata to be transmitted to Vimeo and Bending Spoons; or that Defendant's "Reject All" button on the Resources page would not in fact prevent the continuation of non-essential third-party tracking.

168. At no time during any of my visits did I provide express or implied consent to any of the interception events described herein. On the contrary, on at least one occasion during the relevant period, I expressly withheld consent by clicking "Reject All" on the CookieAdmin banner. Defendant ignored that election.

169. I captured screenshots and HTTP Archive ("HAR") files during certain of my visits, which documentary evidence I have preserved. Those materials depict, confirm, and substantiate the interception events and technical architecture described herein.

170. I continue to desire to browse content on Defendant's Website — including content about new products, regulatory updates, and resource materials. I would like to browse Defendant's Website without having my search queries intercepted by Google, without having

my device and session metadata transmitted to Vimeo and Bending Spoons, without having third-party cookies placed on my device, and without being subjected to a false "Reject All" option. If Defendant's Website were programmed to honor visitors' privacy preferences and to provide accurate notice of its data-sharing practices, I would likely browse the Website again in the future. I cannot do so until then, because: (a) I do not know how Defendant's Website is programmed from time to time; (b) Defendant can unilaterally change the configuration of its Website, and has the power to do so without notice; and (c) I have no practical means to test whether Defendant has remediated the issues described in this First Amended Complaint short of using specialized software-developer tooling and auditing the network traffic on every page of every visit — something no reasonable person should be required to do in order to safely use a commercial website.

***M. Tolling***

171. The applicable statutes of limitations for my claims are tolled by the delayed-discovery rule. I did not, and reasonably could not, have discovered Defendant's unlawful conduct at the time of my earliest visits to Defendant's Website. I learned of Defendant's interception practices through my own inspection of my browser's Network panel on November 7, 2025, when I happened to have Chrome Developer Tools open during a routine search-bar use.

172. Defendant actively concealed the material facts underlying my claims. Defendant's Privacy Statement affirmatively represented that Defendant did not share personal information with third parties for the third parties' own uses, that Defendant imposed confidentiality requirements on any third parties that received visitor data, and that Defendant protected visitor privacy. Those representations were false, as detailed above. Defendant further concealed its practices by presenting a "Reject All" option on the Resources page that was not effective — a

design feature that actively misled visitors into believing their rejection of non-essential cookies had been honored.

173. The average person does not possess the technical training or tooling necessary to detect the interception practices described herein. Chrome Developer Tools — the principal means of observing cross-origin HTTP(S) transmissions — is, by design, a tool for professional software developers. I am not a professional software developer, and my personal awareness of these tools arose from my particular background in LLM interaction and prompt engineering. The average California resident has no reasonable ability to detect the conduct described herein.

174. Defendant has not been prejudiced by any delay in my filing this First Amended Complaint. Defendant has retained — and continues to retain — all the technical infrastructure, contractual relationships, and records relevant to my claims. The technical architecture described herein has remained substantially unchanged throughout the relevant period — as evidenced by (among other things) my repeated observations, during the relevant period, of the same Vimeo cookies placed in an Incognito session on the About Us page and the same keystroke-level search-bar interception architecture that was present on November 7, 2025.

***N. Detailed Enumeration of the Interception Events***

175. The foregoing allegations establish an architecture of interception that generates separate, discrete, contemporaneous interception events across several distinct categories. This Section enumerates, to the extent possible without complete discovery into Defendant's server-side logs and the Third Parties' logs, the interception events I personally experienced.

176. Category A — Keystroke-level search-bar interceptions. On each occasion I used Defendant's on-site search bar to enter a query, each individual keystroke generated one HTTPS

request to clients1.google.com transmitting the cumulative in-progress search string to Google. Specific enumerated events:

(a) November 7, 2025: I typed a five-character string into the search bar of Defendant's homepage. My contemporaneous Chrome Developer Tools screenshot documents at least three separate keystroke-level HTTPS GET requests to clients1.google.com issued during that session.

(b) November 7, 2025 (prior sessions): I typed at least twenty distinct ingredient names into the search bar, attempting to locate products containing each specified ingredient. The ingredient names were between approximately four and twenty characters in length, generating a conservative total of at least 240 additional keystroke-level interception events for that session alone (20 queries × an average of 12 characters each).

(c) Approximately ten additional visits to Defendant's Website on various dates between November 7, 2024 and November 7, 2025, during which I used the search bar at least once per visit. Conservative estimate: at least ten further search sessions with approximately 50-100 keystroke-level interceptions each.

(d) Additional visits during the relevant period, during which I used the search bar. My HAR file alone records at least five discrete interception events (requests 1-5 described in Paragraph 99 above), with a sixth (the final request of the test string typing session) visible in the contemporaneous screenshot. Conservative estimate for these later visits: at least 50 additional keystroke-level interception events.

177. The total number of Category A interception events during the relevant period is, conservatively, at least 800 separate keystroke-level transmissions of search-query contents to

Google. Each such transmission was a separate interception of the contents of an electronic communication.

178. Category B — Vimeo autoplay transmissions on the About Us page (background context for fraud, willfulness, and privacy-intrusion claims; not separately pleaded as standalone statutory interception events). On each visit to Defendant's About Us page, the embedded Vimeo player generated multiple distinct transmissions to Vimeo's various domains and (post-November 24, 2025) to Bending Spoons. These transmissions, while not separately enumerated as statutory interceptions, are relevant to my privacy, intrusion, fraud, and unjust-enrichment claims because they: (a) demonstrate the covert and deceptive nature of Defendant's Website architecture; (b) demonstrate Defendant's willfulness and pattern of conduct; (c) provide notice/consent context for fraud; and (d) augment the highly offensive character of the overall intrusion. Per-visit events include:

(a) One or more HTTPS requests to player.vimeo.com to load the player JavaScript API (player.js) and the video frame;

(b) At least four separate HTTPS requests to f.vimeocdn.com for the player module scripts, vendor module scripts, player CSS, and visitor-unique-identifier utility;

(c) At least one HTTPS request to i.vimeocdn.com for a video thumbnail;

(d) At least eleven HTTPS requests to vod-adaptive-ak.vimeocdn.com for streaming video segments;

(e) At least two HTTPS requests to videoapi-sprites.vimeocdn.com for scrubber-preview sprites;

(f) At least five POST requests to arclight.vimeo.com/add/player-stats conveying session telemetry, each time bearing my session-id;

(g) At least one POST request to lensflare.vimeo.com/add/vimeo.play_video announcing the play event;

(h) One OPTIONS preflight request followed by one POST request to orion.bendingspoons.com/v3/identity/settings conveying my device and session identity to Bending Spoons;

(i) Additional page-level requests to www.gstatic.com for Google Cast framework components, each conveying my IP and referrer to Google;

(j) Additional requests to browser-update.org for the browser-update library, each conveying my IP, user-agent, and referrer to Update AG; and

(k) Additional requests to fonts.googleapis.com, fonts.gstatic.com, and use.fontawesome.com for fonts and icons, each conveying my IP, user-agent, and referrer.

179. I visited Defendant's About Us page on at least four separate occasions during the relevant period. The Vimeo and Bending Spoons transmissions described above provide context for my privacy, intrusion, and fraud claims, but I do not separately count them as statutory interceptions for purposes of damages.

180. Category C — Per-page-load infrastructure transmissions (background context only). On each page load of every page of Defendant's Website I visited, my browser sent HTTPS requests to various third-party infrastructure endpoints embedded on that page (such as fonts.googleapis.com, fonts.gstatic.com, ajax.googleapis.com, www.gstatic.com, use.fontawesome.com, and browser-update.org). These infrastructure transmissions are alleged solely as background context to demonstrate the architecture, scale, and pattern of Defendant's third-party data-sharing arrangements, and the commercial benefit Defendant obtained by procuring third-party services on terms monetized through visitor data. I do not plead these

infrastructure transmissions as standalone statutory interception events under § 631, § 632, or the Federal Wiretap Act.

181. The Category C infrastructure transmissions described above are not separately counted as statutory interceptions for purposes of damages.

182. Category D — First-party cookie placement (background context only). On each fresh visit to Defendant's Website from a browser with no prior Drexel cookies, Defendant placed its first-party "_sfs_id" cookie on my device before any notice or consent. I plead this fact as background context relevant to fraud, privacy intrusion, and "Reject All" non-honoring, but I do not plead first-party cookie placement as a standalone statutory interception under § 631, § 632, or the Federal Wiretap Act.

183. Category E — Third-party Vimeo cookie placement on About Us page (background context only). On each fresh visit to Defendant's About Us page from a browser with no prior Vimeo cookies, the Vimeo iframe caused the "__cf_bm" and "_cfuvid" cookies to be placed on the .vimeo.com domain. I plead this fact as background context relevant to fraud, privacy intrusion, and consent, but I do not plead third-party cookie placement as a standalone statutory interception.

184. Category F — CRM Persistence Script transmissions (background context only). On each visit to Defendant's Website, Defendant's embedded code caused my browser to issue one or more HTTPS requests to http://crm.drexchem.com/crm10/API/marketing/PersistenceScript?profile=drexel. I plead these CRM transmissions as background context relevant to fraud, privacy intrusion, willfulness, and the broader pattern of Defendant's tracking architecture, but I do not plead these CRM

transmissions as standalone statutory interceptions under § 631, § 632, or the Federal Wiretap Act.

185. Total enumeration of statutory interception events. For purposes of pleading the categories of damage I have suffered, I count only Category A — the keystroke-level search-query interceptions transmitted to Google through clients1.google.com — as separately enumerated statutory interception events. Category A alone, conservatively enumerated, accounts for at least 800 separate interception events of the contents of my electronic communications with Defendant's Website during the relevant period. Categories B through F (Vimeo telemetry, infrastructure transmissions, first-party and third-party cookie placements, and CRM persistence transmissions) are pleaded as background context relevant to my privacy, intrusion, fraud, and unjust-enrichment claims, and to demonstrate the architecture, willfulness, and pattern of Defendant's conduct, but are not separately enumerated as statutory interception events for purposes of damages calculation.

(a) 800 separate keystroke-level search-query interceptions to Google;

(b) 120 Vimeo-autoplay-related transmissions;

(c) 225 per-page-load infrastructure transmissions;

(d) 15 first-party cookie placements; and

(e) 4 Vimeo cookie placements.

186. The aggregate statutory damages I am entitled to under California Penal Code § 637.2 and the Federal Wiretap Act, 18 U.S.C. § 2520, will be determined according to the proof at trial and to the statutes' respective measures of damages, applied to the keystroke-level search-query interceptions enumerated above and any additional interception events revealed in discovery. The aggregate statutory damages well exceed $75,000, exclusive of interest and costs,

for purposes of 28 U.S.C. § 1332(a) diversity jurisdiction; they also support federal-question jurisdiction under 28 U.S.C. § 1331 by virtue of the Federal Wiretap Act claim.

***O. Why "Each Interception Is a Separate Violation" Is the Correct Framework***

187. California courts, and federal courts applying California law, have consistently held that each separate interception of an electronic communication gives rise to a separate violation of the California Invasion of Privacy Act and the Federal Wiretap Act. This principle applies with particular force to the architecture at issue here, because (i) each keystroke transmission to Google constitutes a discrete acquisition of a distinct communication (my in-progress search query, which itself changes with each keystroke); (ii) each beacon transmission to Vimeo's telemetry endpoints constitutes a discrete acquisition of a distinct communication (my in-session viewing telemetry); and (iii) each HTTPS request to a Third Party constitutes a distinct interception event bounded by the request-response pairing.

188. The alternative treatment — aggregating all interception events for a given visit into a single "violation" — would effectively nullify the statutory damages provisions of §§ 631(a), 632(a), and the Federal Wiretap Act in the Internet context. Under that approach, a website operator that caused a browser to generate a thousand separate HTTPS requests to data-broker endpoints in a single page load would face only the same statutory penalty as a website operator that caused one such request. Neither the California Legislature nor Congress adopted any such rule; on the contrary, the "per violation" damages provisions were designed to deter the very kind of architectural, high-volume, high-granularity interception that this case presents.

189. I therefore plead that each keystroke-level transmission of search-query contents to Google identified above — and each equivalent transmission revealed in discovery — is a separate and independent interception of an electronic communication, giving rise to a separate

violation of California Penal Code § 631(a) (which provides for statutory damages of $5,000 per violation under § 637.2(a)) and of the Federal Wiretap Act (under which statutory damages are computed pursuant to 18 U.S.C. § 2520(c)(2) as the law allows).

***P. The Third Parties' Operations and Data-Brokering Activities***

190. The Third Parties are each sophisticated, well-resourced commercial actors whose business models depend on the collection and monetization of Internet-user data. The following sub-sections catalog, to the extent known to me at this pleading stage, each Third Party's operations and the commercial uses to which it puts data it collects from Defendant's Website.

***Google LLC***

191. Google is the world's largest digital-advertising company and one of the largest technology companies. In calendar year 2024 (the most recent full year for which public financial data is available at the time of this filing), Alphabet Inc. (Google's parent) reported revenue of approximately $350 billion, the vast majority of which was derived from advertising services. Google's advertising services are fundamentally data-dependent: they target advertisements based on data Google has collected about individual Internet users, including from websites that embed Google's tracking technologies.

192. Google's data-collection operation on the Internet extends across multiple products, including: Google Analytics (web analytics), Google Tag Manager (tag management), Google Ads (advertising), Google DoubleClick and the Google Display Network (ad serving and auctioning), Google Fonts (font delivery), Google Hosted Libraries (JavaScript library hosting), Google reCAPTCHA (bot-detection), Google Cast (video casting), and many others.

193. The clients1.google.com domain specifically hosts Google's autocomplete-suggestion service. When a browser sends a query to clients1.google.com/complete/search,

Google returns a list of suggested completions drawn from Google's aggregated search index and from Google's user-specific profile of the individual (if any) associated with the requesting browser or IP. As part of this service, Google logs the query text, the requesting IP address, the user-agent, any cookies sent with the request, and related metadata. Google uses this data for, among other things, (a) improving its autocomplete suggestions, (b) augmenting its user profile, and (c) serving targeted advertising.

194. Google is a registered data broker with the California Privacy Protection Agency under California's "Delete Act," Cal. Civ. Code § 1798.99.80 et seq. That registration imposes disclosure obligations on Google and is itself evidence that Google's operations constitute "data brokerage" under California law.

195. By handing every keystroke of my search queries to Google's autocomplete service without my consent, Defendant has effectively granted Google — a known, massive, commercially-interested data broker — a front-row seat to my cognitive process as I research agricultural chemicals on Defendant's Website. Google uses this data for its own purposes, not merely to return suggestions to Defendant's visitors.

196. Google's use of the data it receives from Defendant's Website includes, at a minimum:

(a) augmenting Google's behavioral profile of me as an Internet user, with signals corresponding to my interest in agricultural chemicals, specific pesticide ingredients, and related topics;

(b) serving me targeted advertisements across the Google advertising network, including Google Search ads and Google Display Network banner ads, based on that augmented profile;

(c) including, upon information and belief and consistent with Google's known commercial practices, the use of such data in connection with Google's advertising services;

(d) upon information and belief, augmenting Google's data-driven services and product capabilities consistent with Google's publicly disclosed data practices;

(e) providing analytics and reporting services to Defendant and to other commercial operators; and

(f) deriving commercial revenue from each of the foregoing activities.

***Vimeo, Inc.***

197. Vimeo operates a video-hosting and streaming platform. Although Vimeo is commonly described as a "video" company, Vimeo's business model — particularly following its acquisition by Bending Spoons — depends on the collection, aggregation, and monetization of user-behavior data alongside the provision of video-hosting services.

198. Vimeo's player is deeply instrumented to collect data about viewers' behavior. The real-time "player-stats" beacons transmitted to arclight.vimeo.com report, on a rolling basis, the viewer's progress through a video, pauses, replays, exits, and similar behaviors. These beacons are not necessary for video playback; they are diagnostic and analytics signals that enable Vimeo and its business customers to understand viewer behavior and to optimize advertising and monetization strategies.

199. Vimeo's lensflare.vimeo.com endpoint is a dedicated analytics endpoint for the "vimeo.play_video" event — that is, the moment a video begins playback. Vimeo uses this data to, among other things, measure video performance, trigger post-play advertising, and associate viewing events with viewer profiles.

200. Vimeo's vuid (visitor-unique-identifier) and the cookies Vimeo places on the .vimeo.com domain — including "__cf_bm" and "_cfuvid" — permit Vimeo to associate my visit to Defendant's About Us page with any other Vimeo-embedded page I have visited (or subsequently visit) on any website on the Internet. Vimeo thus accumulates a cross-site behavioral profile of me based on my interactions with third-party websites that embed Vimeo's player.

201. Since Vimeo's November 24, 2025 acquisition by Bending Spoons, Vimeo's parent company has begun integrating Vimeo's data-collection infrastructure with Bending Spoons' broader portfolio-level identity-resolution infrastructure. The POST request to orion.bendingspoons.com/v3/identity/settings documented in my HAR file is an artifact of this integration: it is Vimeo's player, configured as a Bending Spoons "bsp_id: vimeo_player" client, reporting my identity and session to the Bending Spoons orion identity service.

***Bending Spoons S.p.A. / Bending Spoons US Inc.***

202. Bending Spoons' business model is one of consolidated portfolio-level data collection across multiple acquired technology brands. As alleged above, Bending Spoons owns and operates Vimeo, WeTransfer, Evernote, Meetup, komoot, Remini, Brightcove, Filmic, and other brands. Each brand operates, among other things, web properties that deploy tracking and identity-resolution infrastructure reporting back to Bending Spoons' central orion endpoint.

203. The /v3/identity/settings endpoint at orion.bendingspoons.com is precisely the kind of identity-resolution service that forms the core of a modern data-broker operation. By receiving identity signals from multiple brands (Vimeo, WeTransfer, komoot, etc.) and across the broader Internet via embedded tracking, Bending Spoons can build cross-property user profiles that any one of its acquired brands — or any third-party integration — could not build alone.

204. By embedding the Vimeo player on its About Us page, Defendant has — knowingly or through willful blindness — procured Bending Spoons' receipt of identity data about Defendant's visitors, including me, for Bending Spoons' commercial exploitation as part of the cross-portfolio data-monetization strategy described above.

***Font Awesome (Fonticons, Inc.)***

205. Font Awesome operates a Content Delivery Network ("CDN") for icon fonts used by commercial websites. Font Awesome's stated business model is licensing-based, but the CDN-based delivery mechanism means that every visit to a website that loads Font Awesome assets generates an HTTPS request to Font Awesome's servers, from which Font Awesome receives visitor IP addresses, user-agents, referrer URLs, and other metadata.

206. Font Awesome's deployment of an account-specific JavaScript bundle (db7df01f48.js) means that Font Awesome receives, for each Defendant page load, a signal identifying that the request is associated with Defendant's customer account. Font Awesome therefore receives — at an account level — visitor traffic data for Defendant's Website.

207. Font Awesome's publicly available privacy and terms documentation does not, to my knowledge, disclaim the use of visitor data beyond asset delivery. Font Awesome may use visitor data for analytics, product development, and related commercial purposes.

***Update AG / browser-update.org***

208. Update AG operates the browser-update.org service, which is embedded on Defendant's Website. The service's stated purpose is to prompt outdated-browser users to update; its technical implementation, however, requires that every page load on every Defendant page trigger an HTTPS request to browser-update.org, thereby transmitting my IP, user-agent, and referrer to Update AG on every visit.

209. Update AG's commercial use of this data, if any, is undisclosed to Defendant's visitors. At a minimum, Update AG obtains a log of the visitor traffic on every site embedding its service.

***CookieAdmin***

210. CookieAdmin operates a CMP used by Defendant on the Resources page. CMP providers typically log visitor consent selections, IP addresses, device identifiers, and timestamps for compliance purposes. CookieAdmin's data-retention, data-sharing, and data-use practices are undisclosed to Defendant's visitors.

***Q. Defendant's Knowledge and Willfulness***

211. Defendant knew, or in the exercise of reasonable care should have known, of the technical architecture of its own Website. In particular:

(a) Defendant either commissioned the development of its Website or retained developers to maintain it. Any developer with ordinary competence can observe, and would observe, the third-party requests that a website causes to be made. The architecture I observed by running Chrome Developer Tools on a stock browser is visible to any developer, web administrator, IT staff member, security auditor, privacy counsel, or QA tester who has performed any reasonable technical review of the Website.

(b) Defendant has deployed a CMP (CookieAdmin) on the Resources page, indicating that Defendant (or someone acting on Defendant's behalf) is aware of the general existence of cookie-consent obligations and the regulatory context in which such obligations arise.

(c) Defendant publishes a Privacy Statement that makes specific representations about data-sharing practices. For Defendant to draft and publish that Privacy Statement without

knowing what data-sharing practices its Website in fact engages in would itself be knowing or reckless conduct.

(d) Defendant manufactures, distributes, and markets regulated agricultural chemicals — a heavily-regulated industry. Defendant's corporate operations include substantial legal, regulatory, and compliance functions. Defendant had the capacity and the resources to audit its Website's compliance with privacy laws.

(e) The practice of third-party web tracking — and the legal risks it creates for website operators — have been the subject of high-profile litigation in California and federal courts since at least 2020. The relevant legal precedents are publicly available and have been extensively reported. A reasonably informed business operator in Defendant's position would have known of the legal risks.

(f) Defendant's "West Coast Sales Representative" announcement confirms Defendant's commercial focus on California and the western United States — a region where CIPA and related California privacy laws are most heavily litigated. Defendant's commercial exposure to California residents gave it every incentive to conduct a privacy audit of its Website; that it did not (or that it did, and disregarded the results) is telling.

212. Defendant acted willfully, intentionally, and with conscious disregard of the rights of California visitors — including me — when it deployed and maintained the interception architecture described in this First Amended Complaint.

***R. Defendant's Continuing Course of Conduct***

213. The interception architecture described herein was, upon information and belief, continuously in place during the relevant period and remains in place as of the date of this filing. I have confirmed, through repeated observations of Defendant's Website during the relevant

period, that (a) the Vimeo cookies (__cf_bm and _cfuvid on the .vimeo.com domain) continue to be placed on visitor devices in the first moments of loading the About Us page, before any consent opportunity; and (b) the keystroke-level interception of search-bar text to clients1.google.com continues to operate in the same DoMini/JSONP architecture I observed on November 7, 2025. The continuation of this conduct is evidence of Defendant's willfulness.

***S. Defendant's Conduct Continues***

214. As of the date of this filing, Defendant continues to operate its Website in substantially the same manner described herein. Each day that passes represents additional violations — not merely of my personal rights, but of the rights of every other California visitor to Defendant's Website.

215. Absent declaratory and injunctive relief, Defendant's ongoing violations will continue.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*Violation of the Federal Wiretap Act*

*18 U.S.C. §§ 2510-2523 (including § 2511)*

216. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

217. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 (together, the "Federal Wiretap Act"), prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). It also prohibits any person who has, by whatever means, knowingly intercepted or procured the

interception of a wire, oral, or electronic communication, from "intentionally disclos[ing]" or "intentionally us[ing]" the contents of that communication. 18 U.S.C. § 2511(1)(c), (d). The Federal Wiretap Act authorizes a civil action for damages by any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the Act. 18 U.S.C. § 2520.

218. My communications with Defendant's Website — including the contents of my search queries typed into Defendant's on-site search bar, the pages I visited on Defendant's Website, the video content I viewed on Defendant's About Us page, and the signaling information my browser transmitted in connection with each such activity — are "electronic communications" within the meaning of 18 U.S.C. § 2510(12). They were transferred by wire and by radio, by means that affect interstate and foreign commerce, from my computer in California through the broader Internet to Defendant's servers and to the servers of the Third Parties.

219. Defendant and the Third Parties — acting at Defendant's invitation, instruction, and with Defendant's procurement — intentionally intercepted the contents of those communications. The interceptions occurred contemporaneously with the communications and while the communications were in transit, in real time. The HAR file I recorded, and the screenshots I captured of my browser's developer-tool Network panel, do not merely show that the Third Parties had the technical capability to intercept my communications — they show that the Third Parties (and in particular Google, by way of clients1.google.com/complete/search) actually received and processed the contents of my keystroke-level search-query communications: each request was answered with an HTTP 200 OK response, the response body contained autocomplete suggestions generated server-side by Google in response to the specific query

string transmitted, and the JSONP callback function in the response was executed by my browser. That sequence — request, server-side response, executed callback — establishes actual receipt and actual processing of the intercepted contents by Google, not mere ability or capability to access them.

220. The "contents" of my communications intercepted by Defendant and the Third Parties include, without limitation: (a) the search queries I typed into Defendant's on-site search bar, intercepted at the per-keystroke granularity described in Paragraphs 88-116 above; (b) the specific pages and URL paths of Defendant's Website that I visited; and (c) my interactions with Defendant's embedded Vimeo video player. These are "contents" within the meaning of 18 U.S.C. § 2510(8), which defines that term as "any information concerning the substance, purport, or meaning" of a communication. Search queries, URL paths revealing page-level content, and video-viewing behaviors all reveal the substance, purport, or meaning of my communications with Defendant.

221. I did not consent to the interception of my communications by the Third Parties. I was not a "party" to any communication between Defendant and the Third Parties; the Third Parties were independent third parties who intercepted my communications with Defendant, not parties who I knowingly invited into those communications.

222. To the extent that Defendant contends it was itself a "party" to my communications and therefore exempt from liability under 18 U.S.C. § 2511(2)(d)'s one-party-consent rule, that argument fails for two independent reasons. First, Defendant did not merely "record" communications to which it was a party; Defendant caused the contents of those communications to be transmitted, in real time, to third parties (the Third Parties) who were not parties to the communications. Second, and independently, the party exception of § 2511(2)(d) does not apply

where the interception is effected "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Defendant's interceptions were made, and caused to be made, for the purpose of enabling the Third Parties' commercial exploitation of my Private Communications in violation of California's common-law tort of intrusion upon seclusion, in violation of California's constitutional right of privacy, and in violation of California Penal Code §§ 631(a) and 632(a) — each of which constitutes a "tortious act" for purposes of the Federal Wiretap Act's crime-tort exception.

223. Defendant "procured" the Third Parties to intercept my electronic communications within the meaning of 18 U.S.C. § 2511(1)(a). Defendant did this by deliberately embedding the Third Parties' tracking scripts, pixels, and iframes into Defendant's Website, by configuring those technologies in the manner described herein (including the autoplay configuration of the Vimeo embed and the DoMini.js / JSONP configuration of the search-bar autocomplete call to clients1.google.com), and by maintaining that architecture knowingly and with the intent to cause the interceptions to occur.

224. Defendant also "intentionally used" the intercepted contents within the meaning of 18 U.S.C. § 2511(1)(d) because Defendant relies on the data generated by these interceptions — including analytics reports, targeting information, and behavioral data — in its own commercial operations.

225. The Third Parties have each used the intercepted contents for their own independent commercial purposes, as alleged in Paragraphs 62, 70, and 75 above. Defendant has enabled, and continues to enable, this use.

226. No exception to liability under the Federal Wiretap Act applies. Specifically: (a) the communications were not in electronic storage but were in transit; (b) I did not consent to the interception, and no consent banner was displayed before the interception of my keystroke-level search data at any point; (c) the party exception does not apply for the reasons set forth in Paragraph 222; (d) no court order authorized the interceptions; and (e) the Third Parties are not "providers" of the electronic communication service at issue, within the meaning of § 2511(2)(a).

227. As a direct and proximate result of Defendant's violations of the Federal Wiretap Act, I have suffered injury — including injury to my statutory privacy rights, injury to the value of my personal data, and loss of my control over the dissemination of my personal communications.

228. Pursuant to 18 U.S.C. § 2520(b) and § 2520(c)(2), I am entitled to recover from Defendant: (a) the actual damages I have suffered and any profits made by Defendant as a result of the violation, or, in the alternative and to the extent permitted by law, statutory damages computed in accordance with § 2520(c)(2); (b) such preliminary and other equitable or declaratory relief as may be appropriate; (c) punitive damages in appropriate cases; and (d) reasonable attorney's fees and other litigation costs reasonably incurred.

229. Pursuant to 18 U.S.C. § 2520(b)(2), I am entitled to recover punitive damages in appropriate cases. Defendant's violations of the Federal Wiretap Act were willful, intentional, and performed with conscious disregard of my statutory privacy rights; they were not inadvertent or technical. Punitive damages are appropriate.

230. Pursuant to 18 U.S.C. § 2520(b)(1) and (b)(3), I am entitled to preliminary and equitable or declaratory relief appropriate to halt Defendant's continuing violations, and to reasonable attorney's fees (if applicable) and other litigation costs reasonably incurred.

## SECOND CLAIM FOR RELIEF

*Violation of the California Invasion of Privacy Act — Wiretapping*

*Cal. Penal Code § 631(a)*

231. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

232. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . or by imprisonment . . . ."

233. California Penal Code § 637.2 authorizes a private right of action by "[a]ny person who has been injured by a violation of this chapter," and authorizes recovery of "(1) Five thousand dollars ($5,000) per violation" or "(2) Three times the amount of actual damages, if any, sustained by the plaintiff," whichever is greater. Cal. Penal Code § 637.2(a). I "need not have suffered any actual damages" to bring this action. Cal. Penal Code § 637.2(c).

234. Each of the three independent clauses of Penal Code § 631(a) that I invoke here — the second, third, and fourth clauses — provides an independent basis for liability. I do not invoke the first clause (the telegraph/telephone clause), which has been construed not to apply to Internet communications.

235. Clause Two: Google, acting at Defendant's invitation, instruction, and with Defendant's procurement, willfully and without the consent of all parties to the communication

read, attempted to read, and learned the contents and meaning of my communications with Defendant's Website while those communications were in transit. Defendant itself was not the eavesdropper under Clause Two; Defendant's liability under § 631(a) primarily arises under Clause Four (set forth at Paragraph 239 below) for aiding, agreeing with, employing, and procuring Google's interception of my search-query communications. Specifically:

(a) Google, by means of the HTTPS requests to clients1.google.com triggered by each keystroke I entered into Defendant's search bar, read and learned the in-progress and complete contents of my search queries — contents that constitute the "contents or meaning" of my communications with Defendant within the meaning of Clause Two.

(b) Vimeo, by means of the player-stats and play-video beacons transmitted during my viewing of the About Us page, read and learned the contents of my video-viewing communications with Defendant — including which video I viewed, for how long, and at what engagement level.

(c) Bending Spoons, by means of the identity-settings request transmitted by the Vimeo player, read and learned the existence, identity, and session details of my communications with Defendant.

(d) The remaining Third Parties read and learned, at a minimum, the URL paths of the pages of Defendant's Website I visited, which URL paths themselves convey the "substance, purport, or meaning" of my communications with Defendant.

236. The interceptions described in Paragraph 235 occurred "in transit" — that is, contemporaneously with the transmission of my communications and not while those communications were in electronic storage. My keystroke-level search query transmissions to clients1.google.com were sent to Google in real time as I typed each character; the Vimeo

telemetry transmissions were sent as beacons during the active playback session; and the page-URL transmissions to the Third Parties occurred as each page of Defendant's Website was loaded.

237. I did not consent to the interceptions, and on at least one occasion during the relevant period affirmatively withheld my consent by clicking "Reject All" on the CookieAdmin cookie banner presented on the Resources page. Defendant proceeded with the interceptions notwithstanding my express declination of consent.

238. Clause Three: After the Third Parties intercepted my communications under Clause Two, Defendant and the Third Parties "used" the information so obtained, or attempted to use that information, for commercial, analytics, targeting, and profile-building purposes. Each such use of the intercepted contents is a separate and independent violation of § 631(a) under Clause Three.

239. Clause Four: Defendant "aid[ed], agree[d] with, employ[ed], or conspir[ed] with" the Third Parties to unlawfully do, or permit to be done, each of the acts prohibited by the foregoing clauses of § 631(a). Specifically, Defendant:

(a) selected, licensed, obtained, or otherwise acquired the scripts, pixels, SDKs, and iframe embeds provided by each of the Third Parties;

(b) integrated those scripts, pixels, SDKs, and iframe embeds into the HTML and JavaScript of Defendant's Website, such that they would execute automatically on visitors' browsers and cause the interceptions to occur;

(c) configured those integrations with parameters — including the "autoplay=1" and "loop=1" parameters on the Vimeo embed, the failure to include any "dnt=1" parameter on the Vimeo embed, and the decision to route the search bar's autocomplete to

clients1.google.com via a JSONP callback — designed to enable or maximize the interceptions;

(d) maintained, monitored, and derived benefit from those integrations, including through analytics reports, customer-targeting capabilities, and advertising optimization; and

(e) failed to take any of the commonly available steps to disable or minimize the interceptions — such as self-hosting video, disabling third-party autocomplete, delivering fonts from first-party infrastructure, or refraining from embedding use.fontawesome.com and browser-update.org — despite having the technical capacity and means to do so.

240. Each of the Third Parties is a separate legal entity that offers software-as-a-service and is not merely a passive device, and each Third Party has the capability to use, and has in fact used, the intercepted contents of my communications for its own independent commercial purposes, as alleged in Paragraphs 62, 70, and 75 above.

241. Defendant is not itself a "party" to the communications intercepted by the Third Parties for purposes of the Clause Four aiding-and-abetting prong of § 631(a). Courts have consistently held that the "party exception" does not shield a website operator who aids and abets a third party's interception.

242. The interceptions of my communications occurred "in this state" — specifically, in California — because I accessed Defendant's Website while physically located in Los Angeles County, California, and the data packets containing my communications originated from and were routed through California-based networking infrastructure before (and, for some transmissions, after) their transit to the servers of the Third Parties.

243. Each separate keystroke-level interception of my search-query communications is a separate and distinct violation of § 631(a). The character-by-character architecture of Defendant's

on-site search bar means that a single search-bar session generates multiple discrete interception events, each one a separate outbound HTTPS request to clients1.google.com transmitting the cumulative in-progress search string.

(a) Each individual keystroke-triggered HTTPS request to clients1.google.com transmitting the contents of my in-progress search query is a separate violation. The character-by-character architecture means that a single search-bar session of an N-character query generates at least N separate violations (with occasional duplicates when the DoMini library queues rapid keystrokes).

244. I estimate that during the relevant period, I personally experienced hundreds of individual § 631(a) violations through keystroke-level interception of my search-query communications transmitted to Google: at least fifteen distinct visits to Defendant's Website, with multiple keystroke-level interceptions per search-bar session, equating conservatively to several hundred or more discrete interception events.

245. The aggregate statutory damages owed to me personally on this Second Claim are substantial, exceeding $75,000 for purposes of subject-matter jurisdiction, with the precise amount to be determined at trial based on the number of interception events established by the proof.

246. I have been injured by reason of Defendant's violations of § 631(a), as described in Paragraphs 146-164 above.

247. Pursuant to Cal. Penal Code § 637.2, I am entitled to statutory damages of $5,000 for each violation, or three times the amount of actual damages, whichever is greater; and to injunctive relief.

248. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein, including the continued permitting of the Third Parties to access, intercept, read, learn, record, collect, and use my and other California visitors' electronic communications with Defendant. Such injunctive relief is necessary to protect me and the public, because I and the general public regularly use the Internet to search for agricultural-chemical and related information, continue to desire to use the Internet for that purpose, and have no practical means to know whether Defendant will honor visitors' privacy preferences or otherwise refrain from the conduct alleged herein.

**THIRD CLAIM FOR RELIEF**

*Violation of the California Invasion of Privacy Act — Recording of Confidential Communications*

*Cal. Penal Code § 632(a)*

249. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

250. California Penal Code § 632(a) provides, in pertinent part:

> "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation . . . ."

251. California Penal Code § 632 provides a private right of action through Cal. Penal Code § 637.2.

252. To state a claim under Penal Code § 632(a), I must plausibly allege: (a) an electronic recording of (b) a confidential communication (c) without the consent of all parties.

253. Electronic Recording. Defendant and the Third Parties used electronic recording devices, instruments, or processes — specifically, the scripts, pixels, SDKs, server-side logging systems, and databases of each Third Party — to record the contents of my communications with Defendant's Website. Each such technology stores, captures, and retains the communications it intercepts.

254. Confidential Communication. My communications with Defendant's Website — and specifically my search queries typed into the Website's on-site search bar and my requests for specific product pages — were "confidential communications" within the meaning of § 632(a). A communication is "confidential" under § 632 when the party asserting confidentiality has an "objectively reasonable expectation" that the communication will not be overheard, recorded, or disclosed..

255. My expectation that my communications with Defendant's Website were confidential was objectively reasonable because: (a) I used the Website's on-site search bar — a tool that, by its name, design, labeling, and placement on the Website, represented to me that it was a means of searching Defendant's site content, not a means of handing my every keystroke to Google; (b) I accessed specific agricultural chemical product pages — including pages identifying specific pesticide active ingredients — which, considered in context, reveal my particular commercial, regulatory, or health-related interests in those ingredients; (c) I navigated through Defendant's Website in a pattern that reveals my commercial and investigative interests, which I reasonably expected Defendant alone (and not the advertising industry at large) to have access to; (d) California's statutory framework — including the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 et seq., enacted in 2020 — establishes baseline public policy that residents of California have a reasonable expectation that their interactions with commercial

websites will not be silently handed to third parties; and (e) Defendant's own Privacy Statement represented to me that my data would not be shared with third parties for those third parties' own uses, which induced and reinforced my objectively reasonable expectation of confidentiality.

256. My communications further revealed aggregate behavioral information that is itself sensitive and confidential. The combination of my IP address, my pattern of page visits, my search queries, my session duration, and my video-viewing behavior constitutes a personally identifying profile that no reasonable person would expect to be handed to Google, Vimeo, Bending Spoons, or other data brokers without their consent..

257. Without My Consent. I did not consent — expressly or impliedly — to the electronic recording of my communications by Defendant or by the Third Parties. On at least one occasion during the relevant period, I expressly declined to consent by clicking "Reject All" on the CookieAdmin banner. Defendant proceeded with the recording notwithstanding my express declination.

258. Defendant's recordings and procurement of recordings of my confidential communications were willful and intentional. Defendant knew, or in the exercise of reasonable diligence should have known, that the third-party scripts and pixels it had embedded on its Website would capture the contents of visitor communications with the Website.

259. Each separate recording of a confidential communication is a separate violation of § 632(a). The same enumeration of violations set forth in Paragraph 243 above applies here.

260. I have been injured by reason of Defendant's violations of § 632(a), as described in Paragraphs 154-156 above (commercial value of my data) and elsewhere in this First Amended Complaint.

261. Pursuant to Cal. Penal Code § 637.2, I am entitled to statutory damages of $5,000 for each violation, or three times the amount of actual damages, whichever is greater, plus injunctive relief.

**FOURTH CLAIM FOR RELIEF**

*Intrusion Upon Seclusion*

*(California Common Law)*

262. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

263. The California common-law tort of intrusion upon seclusion has two elements: (a) the defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy; and (b) the intrusion occurred in a manner highly offensive to a reasonable person.

264. Defendant — directly and by its deliberate procurement of the Third Parties' tracking architecture — intentionally intruded into matters as to which I had a reasonable expectation of privacy. Specifically, Defendant intruded upon:

(a) the contents of my search queries typed into Defendant's on-site search bar, including the intimate cognitive process reflected in my keystroke-by-keystroke composition of those queries — a process that reveals my thoughts, hesitations, deletions, and mid-word reconsiderations at a granularity that the Third Parties' DoMini/JSONP architecture captures in full;

(b) my private viewing and interaction behaviors with respect to the embedded Vimeo video content on Defendant's About Us page, including the facts that I loaded the page, how long I remained there, and what engagement I had with the video;

(c) my private browsing history and navigation pattern across Defendant's Website, including which specific product pages, product category pages, and resource pages I viewed, and in what sequence;

(d) my device identifiers, session identifiers, and cross-page and cross-property linkage data, which Defendant enabled the Third Parties to collect and use to construct a cross-site profile of my identity and behavior that persists beyond my session on Defendant's Website; and

(e) the aggregate of these matters, which together constitute a detailed record of my commercial, informational, and recreational interests on the Internet that I reasonably expected to remain private.

265. My expectation of privacy in these matters was reasonable. The reasonable expectations of California Internet users with respect to opt-out selections, third-party tracking, and the silent hand-off of search queries to Google have, as a matter of California public policy, been anchored by the California Consumer Privacy Act (Cal. Civ. Code § 1798.100 et seq., effective January 1, 2020). The CCPA establishes that California residents have a statutorily cognizable interest in controlling the collection, use, and sharing of their personal information.

266. My expectation of privacy was further reinforced by Defendant's own Privacy Statement, which affirmatively represented that Defendant did not share personal information with third parties for their own uses and that any third parties receiving visitor data were subject to confidentiality obligations. A reasonable person in my position would, and I did, take Defendant at its word.

267. Defendant's intrusion was highly offensive to a reasonable person. Several features of the intrusion establish the "highly offensive" element:

(a) Deception. Defendant affirmatively misrepresented its data practices in its Privacy Statement and in the CookieAdmin banner, and proceeded with the tracking after I expressly rejected non-essential cookies. Deception is the "plus-factor" that pushes technical interception into highly offensive territory.;

(b) Scope. Defendant handed my communications to numerous Third Parties, each with its own commercial incentive to aggregate, profile, and monetize my data. This is categorically different from passive observation of in-store browsing. The interceptions here were granular (every keystroke), persistent (every page load), and widely distributed (to numerous commercial actors).

(c) Aggregation. The categories of information Defendant enabled the Third Parties to collect — search queries, URL paths, IP addresses, session identifiers, video-viewing behaviors, device metadata — together permit the Third Parties to compile a detailed, identifying profile of my personal interests, inclinations, and activities. Ninth Circuit authority recognizes that the aggregation of individually non-sensitive data points into a cross-site behavioral profile gives rise to a cognizable privacy intrusion.

(d) Covertness. The interceptions were not disclosed to me in any meaningful way. The on-site search bar was unmarked as a Google autocomplete conduit; the About Us page did not warn that visiting it would transmit my identity to Bending Spoons; and the Resources page's CookieAdmin banner misrepresented what "Reject All" would accomplish.

(e) No consent. I did not consent. And to the extent that any consent might be inferred from my continued use of the Website after the banner appeared on the Resources page, that inference is foreclosed by my express rejection of consent by clicking "Reject All" and

by the fact that the banner never appeared on the pages (including the About Us and homepage) where the earliest cookie placements and interceptions occurred.

(f) Granularity. The keystroke-by-keystroke nature of the Google autocomplete transmission — where every letter I pressed generated a discrete outbound HTTPS request carrying the typed-so-far content — is substantially more invasive than the kind of summary analytics or logged-after-submit architectures that have been the subject of prior litigation. Each character of my thought process, including partial words and reconsiderations, was handed to Google. This level of granularity is categorically different from observing that a user "searched for X"; it is observing the user's process of formulating the query, character by character.

268. Whether the intrusion was "highly offensive" is ordinarily a question for the trier of fact.

269. Defendant's intrusion has caused me damages, including injury to my privacy rights; loss of control over the dissemination and use of my Private Communications; diminution of the value of my personal data; and emotional distress arising from the knowledge that my interactions with a commercial website I patronized in good faith were handed to third parties for commercial exploitation.

270. I am entitled to compensatory damages, including damages for the diminution of value of my personal data, in an amount to be proven at trial.

271. I am further entitled to disgorgement of the profits Defendant has obtained as a result of its wrongful intrusions, together with the value of the data shared with the Third Parties.

272. Defendant's actions were malicious, oppressive, and willful. They were calculated to enable the commercial exploitation of my private data, and they were performed in conscious disregard of my privacy rights. I am entitled to punitive damages under Cal. Civ. Code § 3294.

273. I am further entitled to permanent injunctive relief enjoining Defendant from continuing the tortious conduct described herein.

**FIFTH CLAIM FOR RELIEF**

*Invasion of Privacy*

*(California Constitution, Art. I, § 1)*

274. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

275. Article I, Section 1 of the California Constitution guarantees all Californians the inalienable right of privacy. That right encompasses the interest in "preventing government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.".

276. To state a claim for invasion of privacy under Article I, Section 1, I must allege: (a) a legally protected privacy interest; (b) a reasonable expectation of privacy; and (c) conduct by Defendant constituting a serious invasion of privacy.

277. Legally protected privacy interest. I have a legally protected privacy interest in, among other things: (a) my statutory rights under California Penal Code §§ 631(a) and 632(a), to the extent that these statutes codify and define protected privacy interests; (b) my constitutional right of privacy under Article I, Section 1; (c) my right to determine for myself the extent to which my personal information is collected, shared, and used, consistent with the California

Consumer Privacy Act, Cal. Civ. Code § 1798.100 et seq.; and (d) the common-law interests protected by the tort of intrusion upon seclusion.

278. Reasonable expectation of privacy. I had a reasonable expectation of privacy in the matters described in Paragraph 264 above. My expectation was reasonable for the reasons set forth in Paragraphs 265-266.

279. Serious invasion. Defendant's intrusion into my legally protected privacy interests was serious. Serious invasion is established by the same factors that establish the "highly offensive" element of intrusion upon seclusion (Paragraph 267), and by the aggregation of those factors. The seriousness of the invasion is itself a question for the trier of fact.

280. Defendant's invasion is not justified by any legitimate competing interest. Defendant's interest is in the commercial monetization of visitor data, which is not a legitimate countervailing interest.

281. Defendant's invasion of my constitutional privacy rights has caused me damages, including injury to my privacy rights; loss of control over my personal information; diminution of the value of my personal data; and emotional distress.

282. I am entitled to compensatory damages, nominal damages, punitive damages, disgorgement, and permanent injunctive relief.

**SIXTH CLAIM FOR RELIEF**

*Fraud, Deceit, and Misrepresentation*

*(California Common Law)*

283. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

284. California common-law fraud requires: (a) a misrepresentation (whether by false representation, concealment, or nondisclosure of a material fact the defendant had a duty to disclose); (b) knowledge of falsity (or scienter); (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage.

285. Misrepresentations. Defendant made the following material misrepresentations:

(a) On the Resources page, Defendant (through the CookieAdmin cookie consent banner) represented: "Click . . . Reject All to decline non-essential cookies." This representation was false because clicking "Reject All" did not in fact decline non-essential cookies or the tracking technologies described herein. I clicked "Reject All" on the CookieAdmin banner during the relevant period in reliance on this representation, and Defendant nonetheless continued to cause my browser to transmit search-query contents to Google and to engage in the other tracking and transmission practices described herein.

(b) In its Privacy Statement, Defendant represented: "All such third parties are prohibited from using your personal information except to provide these services to Drexel Chemical Company, and they are required to maintain the confidentiality of your information." This representation was false. Google, Vimeo, and (post-November 24, 2025) Bending Spoons are not in fact prohibited from using visitor data except to provide services to Defendant; on the contrary, those Third Parties' business models depend upon their independent use of such data for their own commercial purposes. No "confidentiality" obligations of the kind described in the Privacy Statement are, in fact, enforceable against these Third Parties by Defendant's visitors.

(c) Through the design, labeling, and placement of the Website's on-site search bar — and by the absence of any disclosure to the contrary — Defendant impliedly represented that text

entered into the search bar would be used by Defendant for Defendant's on-site search indexing and would not be transmitted to third parties. This implied representation was false. Each keystroke I typed into the search bar was in fact transmitted to Google in real time, via the DoMini/JSONP architecture described in Section IV.D above.

(d) In its Privacy Statement, Defendant represented: "Drexel Chemical Company does not sell, rent or lease its customer lists to third parties." To the extent the Privacy Statement representations regarding sale, rental, and leasing of customer lists are construed broadly to encompass the categories of visitor data Defendant in fact transferred to the Third Parties, this representation was false.

(e) Through the embedding of the Vimeo video player on the About Us page, and through the absence of any notice or disclosure that the video would autoplay and that autoplay would cause visitor metadata to be transmitted to Vimeo and Bending Spoons, Defendant impliedly represented that visiting the About Us page did not involve the transmission of visitor data to third parties. This implied representation was false.

(f) By providing a Privacy Statement and Terms of Use that failed to disclose the interception practices described herein, Defendant impliedly represented that no material undisclosed data practices existed. This implied representation was false — numerous material data practices, including the keystroke-level Google autocomplete interception and the Bending Spoons identity transmission, were not disclosed.

286. Defendant had a duty to disclose the omitted material facts. A party to a commercial transaction has a duty to disclose facts where: (a) the facts are material, (b) the facts are known to the defendant and not reasonably accessible to the plaintiff, and (c) the defendant knows or should know that the plaintiff is acting in ignorance of those facts. Defendant knew the technical

configuration of its own Website, knew that its embedded search bar handed keystrokes to Google, knew that its About Us page autoplayed a Vimeo embed that transmitted metadata to Vimeo and Bending Spoons, and knew that its "Reject All" button on the Resources page was ineffective with respect to the described interceptions. Ordinary peopel — including me — could not access these facts without specialized developer tooling and technical expertise.

287. Knowledge of falsity (scienter). Defendant knew that each of the foregoing representations and implied representations was false when made, or made them without regard to whether they were true or false. Defendant knew the technical architecture of its own Website and knew what data was being transmitted to the Third Parties. Defendant was — or in the exercise of ordinary diligence should have been — aware of the contents of its own Privacy Statement and cookie banner. Defendant was also aware — or should have been aware — that its configuration of the Vimeo embed with "autoplay=1" would cause the cascade of transmissions described above and that its configuration of the on-site search bar to route through clients1.google.com via the DoMini library would cause keystroke-level interceptions.

288. Intent to induce reliance. Defendant made the foregoing misrepresentations and omissions with intent to induce visitors — including me — to rely on them by, among other things, (a) continuing to use the Website (thereby generating traffic and commercial benefit for Defendant), (b) entering search queries into the search bar (thereby generating advertising-relevant behavioral data), (c) providing Defendant with personal information through the Website, and (d) refraining from deploying privacy-protective countermeasures that I would otherwise have used.

289. Justifiable reliance. I justifiably relied on Defendant's representations and omissions. My reliance was justifiable because: (a) Defendant's representations were plausibly framed as the

Website's Privacy Statement, a document visitors ordinarily consult to understand data practices; (b) the search bar was a standard, expected web feature that I reasonably assumed operated the way search bars ordinarily operate (i.e., transmitting data to the site's own search indexing, not to third-party autocomplete services); (c) the "Reject All" button was a standard, expected consent-management affordance that I reasonably assumed operated the way such buttons ordinarily operate (i.e., rejecting what it said it would reject); and (d) I had no technical means to verify Defendant's representations without deploying specialized developer tooling. Reliance is justifiable where, as here, the defendant is the party in possession of the facts at issue and the plaintiff lacks the means or occasion to uncover them.

290. Specifically, but for Defendant's misrepresentations and omissions, I would not have: (a) used Defendant's Website at all, or, at a minimum, would not have used the Website without deploying specialized privacy-protective countermeasures (including, for example, browser-based tracker blockers, DNS-level advertising blocking, or VPN-based traffic routing); (b) typed my search queries into the Website's on-site search bar; (c) visited the About Us page; or (d) continued my browsing session after viewing and acting upon the CookieAdmin cookie banner (had I known it was ineffective, I would have immediately closed my browser tab).

291. Resulting damage. I have suffered actual damages as a result of Defendant's misrepresentations and omissions, including:

(a) the loss of value of my personal data, which has been transferred to the Third Parties (each of whom now has additional data about me than they would have had absent Defendant's conduct);

(b) the loss of my control over the dissemination and use of my Private Communications;

(c) the statutory violations described in the First through Third Claims above, which would not have occurred but for Defendant's misrepresentations and omissions inducing my continued use of the Website;

(d) my time and effort expended in investigating and documenting Defendant's interception architecture, in preparing and filing this litigation, and in implementing ongoing privacy-protective measures to mitigate the consequences of Defendant's conduct; and

(e) emotional distress.

292. I plead this claim with the particularity required by Federal Rule of Civil Procedure 9(b). Specifically: the "who" is Drexel Chemical Company; the "what" is the misrepresentations and omissions set forth in Paragraph 285 above; the "when" is the period from November 7, 2024 to the present, and more particularly includes November 7, 2025 (the date of the interception I contemporaneously documented in my Network-panel screenshot), and additional occasions during the relevant period on which I observed the conduct described herein (including the dates of my Incognito-mode "Reject All" click that was ignored, my observation of Vimeo cookies placed before any consent, and the recording of the HAR file documenting the keystroke-level interception); the "where" is Defendant's Website at https://www.drexchem.com/, and specifically including the Privacy Statement at https://www.drexchem.com/privacy-statement-3/, the Resources page at https://www.drexchem.com/resources/, the About Us page at https://www.drexchem.com/about-us/, and the homepage at https://www.drexchem.com/; and the "how" is the technical architecture described in Sections IV.C-H of this First Amended Complaint, which Defendant deployed with knowledge of its material effects while simultaneously representing to visitors that no such effects occurred.

293. I am entitled to compensatory damages, punitive damages (because Defendant's conduct was malicious, oppressive, and fraudulent within the meaning of Cal. Civ. Code § 3294), and such further relief as the Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF**

*Unjust Enrichment / Quasi-Contractual Restitution*

*(California Common Law)*

294. I incorporate by reference the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

295. This claim is pleaded separately and in the alternative to the foregoing claims, under Federal Rule of Civil Procedure 8(d)(2). I allege that I have no adequate remedy at law for the conduct described herein, because monetary damages alone cannot undo the fact that Defendant (and, through Defendant, the Third Parties) now hold — and will indefinitely continue to hold — a body of my Private Communications data that they would not have absent Defendant's wrongful conduct, and which Defendant and the Third Parties will continue to exploit for their commercial benefit. Equitable restitution is necessary and appropriate.

296. California recognizes the principle that a defendant who has been unjustly enriched at the expense of another "may be required to make restitution.".

297. Although California does not recognize a standalone cause of action labeled "unjust enrichment," courts consistently construe such a cause of action as a quasi-contract claim seeking restitution.. I accordingly pursue this claim as a quasi-contract restitution claim.

298. I do not allege — and this claim does not depend on the existence of — an enforceable contract between me and Defendant. I did not affirmatively accept any Terms of Use through a click-to-accept mechanism, and I have no enforceable contractual relationship with

Defendant. This pleading is consistent with Rule 8(d)(2) alternative pleading and is not foreclosed by any contract-based theory.

299. Defendant has been unjustly enriched at my expense, through at least the following mechanisms:

(a) Defendant has received, and continues to receive, commercial benefit — including analytics reports, targeted-advertising capabilities, website-optimization insights, and related commercial value — by virtue of its procurement of the Third Parties' tracking of visitor communications, including mine.

(b) Defendant has obtained — in effect — advertising services, analytics services, video-hosting services, font-delivery services, and related services from the Third Parties on commercially favorable terms (often free of cost to Defendant) specifically because the Third Parties are compensated by monetizing the visitor data they collect through their embedded tracking.

(c) Defendant has avoided the cost it would have had to bear, in a world of genuine privacy respect, of: (i) self-hosting video content; (ii) purchasing paid analytics and advertising services that did not monetize visitor data; (iii) implementing consent-management infrastructure that in fact honored visitors' preferences; (iv) redesigning its search bar to not route through Google's autocomplete service; and (v) reconfiguring its third-party dependencies to respect visitor privacy.

300. Defendant's enrichment is unjust because it was procured through the misrepresentations, concealment, and nondisclosure described herein, and in violation of the California Invasion of Privacy Act, the Federal Wiretap Act, and California's constitutional and

common-law privacy rights. The benefits Defendant has obtained are morally and legally owed to me (and other California visitors), not to Defendant.

301. My Private Communications have conferred an economic benefit on Defendant. The commercial value of my data is established by the metrics set forth in Paragraphs 154-156 above.

302. Defendant has knowingly accepted and retained these benefits. It would be inequitable and unconscionable for Defendant to be permitted to retain the benefits of its wrongful conduct.

303. I am entitled to restitution of the amounts by which Defendant has been unjustly enriched, including: (a) the fair market value of the data Defendant has transferred to the Third Parties; (b) the reduction in Defendant's costs of operating the Website that is attributable to its decision to procure third-party tracking services on a "free" basis monetized through visitor-data collection; (c) the profits Defendant has generated from targeted advertising, optimized product marketing, and similar commercial activities enabled by the unlawful data-collection practices described herein; and (d) such additional measures of restitution as the evidence at trial may support.

304. I further am entitled to equitable restitution, disgorgement, and such other equitable relief as the Court deems just and proper.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vivek Shah respectfully requests that the Court enter judgment in his favor and against Defendant Drexel Chemical Company as follows:

A. On the First Claim for Relief (Violation of the Federal Wiretap Act, 18 U.S.C. §§ 2510-2523): actual damages and any profits made by Defendant as a result of the violations, or in the alternative statutory damages computed in accordance with 18 U.S.C. § 2520(c)(2)

to the extent permitted by law; punitive damages under 18 U.S.C. § 2520(b)(2); reasonable attorney's fees and litigation costs under 18 U.S.C. § 2520(b)(3); and declaratory and equitable relief under 18 U.S.C. § 2520(b)(1);

B. On the Second Claim for Relief (Violation of Cal. Penal Code § 631(a)): statutory damages of $5,000 per violation, or three times the amount of actual damages, whichever is greater, under Cal. Penal Code § 637.2(a); and injunctive relief under Cal. Penal Code § 637.2(b);

C. On the Third Claim for Relief (Violation of Cal. Penal Code § 632(a)): statutory damages of $5,000 per violation, or three times the amount of actual damages, whichever is greater, under Cal. Penal Code § 637.2(a); and injunctive relief under Cal. Penal Code § 637.2(b);

D. On the Fourth Claim for Relief (Intrusion Upon Seclusion): compensatory damages in an amount to be proven at trial; damages for diminution of the value of Plaintiff's personal data; disgorgement of profits; nominal damages; punitive damages under Cal. Civ. Code § 3294; and permanent injunctive relief;

E. On the Fifth Claim for Relief (Invasion of Privacy, Cal. Const. art. I, § 1): compensatory damages in an amount to be proven at trial; nominal damages; disgorgement of profits; punitive damages under Cal. Civ. Code § 3294; and permanent injunctive relief;

F. On the Sixth Claim for Relief (Fraud, Deceit, and Misrepresentation): compensatory damages in an amount to be proven at trial (including diminution of the value of personal data, restitution, and the benefit of what Plaintiff would have received absent the fraud); punitive damages under Cal. Civ. Code § 3294; and such further relief as the Court deems just;

G. On the Seventh Claim for Relief (Unjust Enrichment / Quasi-Contractual Restitution): restitution, disgorgement, and such further equitable relief as is necessary to return Plaintiff to the position he would have occupied absent Defendant's wrongful conduct;

H. Pre-judgment and post-judgment interest at the maximum rates allowable by law;

I. A public and private, permanent injunction enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair practices described in this First Amended Complaint — specifically including an injunction requiring Defendant to: (i) refrain from transmitting the contents of visitors' search queries to any third party without clear and conspicuous prior notice and affirmative consent; (ii) refrain from autoplaying embedded third-party video players without clear and conspicuous prior notice and affirmative consent; (iii) refrain from setting or causing to be set any third-party cookie on visitors' devices without clear and conspicuous prior notice and affirmative consent; (iv) honor visitors' "Reject All" elections on any cookie consent banner by, in fact, declining to cause any non-essential cookie or tracking transmission to occur; (v) correct Defendant's Privacy Statement to accurately disclose Defendant's data practices; (vi) disclose, on every page of the Website where interception architecture is present, a clear and conspicuous notice identifying each recipient Third Party; and (vii) deliver to Plaintiff a complete accounting of the data Defendant and the Third Parties have collected about Plaintiff, together with confirmation that such data has been deleted and that the Third Parties have certified such deletion to Defendant;

J. Declaratory relief establishing the illegality of Defendant's conduct under the statutes and common-law doctrines invoked herein, and declaring Plaintiff's rights accordingly;

K. Reasonable attorney's fees (if and to the extent recoverable), costs of suit, and all other litigation expenses; and

L. Such other and further relief as the Court deems just and proper.

**VII. DEMAND FOR JURY TRIAL**

Plaintiff Vivek Shah hereby demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

Dated: May 6, 2026

Respectfully submitted,

/s/ Vivek Shah

Vivek Shah
1301 N Broadway Ste 32167
Los Angeles, CA 90012
Telephone: (224) 246-2874
Email: newvivekshah@gmail.com